1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  L.H., A.Z., D.K., and D.R.,
    on behalf of themselves and
12  all other similarly
    situated juvenile parolees
13  in California,
                                  NO. CIV. S-06-2042 LKK/GGH
14          Plaintiffs,

15      v.                                    O R D E R

16  ARNOLD SCHWARZENEGGER,
    Governor, State of
17  California, et al,

18          Defendants.
    _____/
19

20      Plaintiffs, juvenile parolees in California, allege that

21  defendants have a policy and practice of denying juvenile parolees

22  their constitutional rights to due process, equal protection and

23  effective assistance of counsel.  Plaintiffs also allege that

24  defendants have a policy and practice of denying class members with

25  disabilities their statutory rights under the Americans with

26  Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101-12213, and section

                                  1

1  504 of the Rehabilitation Act, 29 U.S.C. § 794.

2      Pending before the court are three motions, plaintiffs'

3  motion for class certification and defendants' motion to dismiss

4  and/or strike, as well as a motion to use plaintiffs' full names.

5  The court resolves the motions based on the papers and after oral

6  argument.

7                              I.

8                 Factual Allegations & Background

9      This suit is brought by four plaintiffs, L.H., A.Z., D.K., and

10 D.R., on behalf of "a class of over 4,000 juveniles who have been

11 or are at imminent risk of being wrongfully and unconstitutionally

12 deprived of their liberty in connection with the granting,

13 extending and/or revoking of their parole in California."  First

14 Amended Complaint ¶ 1 ("FAC").

15 **A.    The Four Named Plaintiffs**

16     **1.    L.H.**

17     L.H. is a 23-year-old Department of Juvenile Justice ("DJJ")

18 parolee, who has spent approximately five years in DJJ facilities.

19 FAC ¶ 72.  He was paroled and then placed under a parole hold

20 (arrested) for being under the influence of alcohol while living

21 at a residential substance abuse center.  L.H. did not receive a

22 preliminary hearing.  Plaintiffs aver that after more than a month

23 in custody, on the date appointed for L.H's parole revocation

24 hearing, the parole officer assigned to the case failed to bring

25 the case file, resulting in an additional three weeks of delay.

26 L.H. was therefore in DJJ custody without a probable cause or

1   revocation hearing for more than two months.   Id.

2        When L.H.'s hearing occurred, L.H. avers that he did not know

3   he had the right to counsel and was not appointed counsel.   FAC ¶

4   73. L.H. was sentenced to serve additional months in DJJ custody.

5        L.H. maintains that he has needed special education since

6   childhood and requires assistance with reading.   FAC ¶ 74.

7   According to the complaint, L.H. suffered from developmental delays

8   attributable to premature birth and a head injury during childhood.

9   L.H. maintains that he is an individual with a disability as that

10  term is defined in Section 504 and the ADA.

11       L.H. is currently on parole until 2008.

12       **2.   A.Z.**

13       A.Z. is a 22-year-old DJJ parolee, who recently served a six

14  month parole revocation term.   A.Z. has been subject to parole

15  revocation proceedings on three separate occasions.   In all three

16  proceedings, A.Z. asked for counsel but was informed that counsel

17  could not be appointed.   A.Z. alleges that the hearings were

18  conducted without counsel.   FAC ¶ 76. A.Z. also maintains that the

19  hearings occurred more than 50 miles from A.Z.'s residence, making

20  it difficult or impossible for him to present witnesses in his

21  favor.   Id.  Moreover, A.Z. had been in custody for several months

22  prior to the hearings.   Id.

23       At A.Z.'s most recent revocation hearing, the hearing officer

24  asked whether he was "harmed" by the parole department's inability

25  to find a police report of his arrest.   A.Z., unrepresented by

26  counsel, replied in the negative.   In retrospect, A.Z. maintains

1  that this was incorrect.  He was harmed because he had to serve an

2  additional 30 days in county jail while parole representatives

3  searched for the police report.  FAC ¶ 77.

4      A.Z. also maintains that at the last minute, and without any

5  notice or explanation, A.Z.'s parole agent changed the sentence

6  recommendation from continuation on parole to return to custody.

7  The hearing officer revoked A.Z.'s parole, refusing to give him

8  credit for the 30 days served in county jail.  A.Z. promptly

9  attempted to appeal that decision, but his appeal was initially

10 "lost" and only granted after his attorney wrote to defendants.  Id.

11 A.Z. alleges that his case was particularly complex because

12 criminal charges were brought in addition to parole revocation

13 charges, and, as discussed, the related police report was lost for

14 30 days.  FAC ¶ 78.

15     A.Z. is currently on parole until 2008.

16     **3.   D.K.**

17     D.K. is a 23-year-old currently released on parole

18 supervision.  After being released on parole in June 2005, he was

19 arrested by his parole agent on or about August 15, 2005 for an

20 alleged "dirty" drug test and was incarcerated pending his parole

21 revocation hearing.  D.K. avers that he did not receive a copy of

22 the drug test results, and he did not receive a preliminary

23 hearing.  On or about September 1, 2005, D.K. received notice that

24 he would have a parole revocation hearing on September 8.  With

25 such short notice, D.K. maintains that it was difficult or

26 impossible to obtain witnesses or evidence in his favor.  Despite

the short notice, his mentor, who helped D.K. find employment when he was released on parole, appeared for the hearing.  This witness, however, was not permitted to speak.  FAC ¶ 81.

The revocation hearing was conducted without an attorney to represent D.K. despite his request for assistance.  Per his parole agent's recommendation, D.K. was continued on parole.  He was released to parole supervision on or about September 15, 2005, a month after his initial arrest.  D.K. alleges that he lost his job as a result of the month in custody. Id.

D.K. avers that he has history of drug and alcohol abuse and has participated in substance abuse counseling beginning before his release from custody.  FAC ¶ 82.  He does not have a high school diploma or G.E.D.  At the time of his arrest and revocation hearing, his DJJ file contained diagnoses of mental disorders.  Id. D.K. asserts that he is an individual with a disability as that term is defined in Section 504, 29 U.S.C. section 705(20), and the ADA.

D.K. is on parole until 2007.

**4.   D.R.**

D.R. is a 23-year old DJJ parolee, who was first committed to DJJ five years ago.  D.R. paroled in January 2004, and was living in the community. In or around December 2004, D.R. was arrested and placed in custody on three alleged parole violations: use of marijuana, driving on a suspended/revoked license, and failure to report a police contact to his parole agent.  D.R. received notice of the alleged charges over a month after he was taken into

1   custody, a mere four days before his revocation hearing.  D.R. did

2   not receive a preliminary hearing.  FAC ¶ 84.

3        At his hearing, D.R. maintains that he requested two

4   evidentiary witnesses, neither of whom was called by defendants.

5   D.R. also alleges that he was never shown the laboratory results

6   upon which the marijuana charge was based.  D.R. asserts that he

7   did not request an attorney because he was informed that he was not

8   eligible for appointed counsel.  Id.

9        D.R.'s parole was revoked in January 2005.  He immediately

10  appealed the decision, stating that his due process rights were

11  violated by defendants' failure to provide sufficient notice of the

12  hearing and the failure to call his witnesses.  D.R. requested, but

13  never received, a copy of his hearing tape. Three months later, the

14  appeal was denied.  FAC ¶ 86.

15       D.R. asserts that he spent 21 months in custody and went to

16  four Parole Consideration Hearings before the BPH finally ended his

17  parole revocation term and released him.  D.R. requested, but never

18  received, copies of two of his Parole Consideration Hearing tapes.

19  FAC ¶ 87.

20       D.R. maintains that he has a history of mental health

21  concerns, and attempted suicide while in custody for his parole

22  revocation.  D.R. maintains that DJJ failed to provide him with

23  adequate treatment or counseling, yet at one of his parole

24  consideration hearings, BPH expressly denied parole to D.R. due to

25  his need for mental health treatment.  After that hearing, D.R. did

26  not see a mental health professional again for months.  FAC ¶ 88.

1    D.R. is on parole until 2007.

2    **B.   Plaintiffs' General Allegations**

3    Plaintiffs assert that these experiences are part of
4    defendants' general practice of, among other things: (1) failing
5    to provide preliminary hearings to determine whether there is
6    probable cause to believe there has been a parole violation, FAC
7    ¶ 28 (2) failing to provide or allow for assistance of counsel when
8    required by law, id. at ¶ 51-61 (3) failing to allow parolees an
9    opportunity to confront witnesses or present evidence, id. at ¶
10   33-38, 50 and (4) failing to hold final parole revocation
11   proceedings within a reasonable time, id. at ¶ 32.

12   Plaintiffs maintain that their status as juveniles causes them
13   to be in particular need of constitutional and statutory
14   protections.  Plaintiffs' complaint sets forth the ways in which
15   juvenile parolees are less educated, less mature and less able to
16   understand the revocation process as compared to adult parolees.
17   FAC ¶ 2, 5-23.  For example, it is estimated that among juvenile
18   detainees in the United States, nearly 60 percent read at or below
19   a fifth to sixth grade level, with 32 percent reading at or below
20   a fourth grade level.  Id. ¶ 6.  Plaintiffs also aver that one
21   report estimates that as many as 60 or 70 percent of incarcerated
22   youth nationwide have diagnosable mental disorders.  Id. ¶ 12.
23   Plaintiffs assert that these sorts of factors exacerbate the
24   problems faced by juvenile parolees.  In part because DJJ is
25   administered within the adult correctional system, plaintiffs
26   maintain that DJJ staff have no background or training in juvenile

1   parole matters. Id.   ¶ 21.

2   **C.   The Proposed Class**

3        The proposed class consists of juvenile parolees in or under

4   the jurisdiction of California, including all juvenile parolees

5   with disabilities as that term is defined in Section 504 of the

6   Rehabilitation Act and the ADA, who are:  (i) in the community

7   under parole supervision or who are at large (ii) in custody in

8   California as alleged parole violators, and who are awaiting

9   revocation of their parole or (iii) in custody, having been found

10  in violation of parole and returned to custody. FAC ¶ 105.

11  **D.   Related Cases**

12       On September 15, 2006, the court related the pending suit to

13  Valdivia v. Schwarzenegger, No. Civ. S-94-0671 LKK/GGH (E.D. Cal.

14  1994).  In Valdivia, plaintiffs are adult parolees in California.

15  The Valdivia plaintiffs brought suit alleging, inter alia, that

16  California's parole process deprived them of due process and their

17  right to counsel under the Sixth Amendment.  See 2002 Complaint.

18  On June 14, 2002, the court granted plaintiffs' motion for summary

19  judgment, holding that the "current California parole revocation

20  system violated the plaintiffs' due process rights." Valdivia v.

21  Davis, 206 F. Supp. 2d 1068, 1078 (E.D. Cal. 2002) (Karlton, J.).

22       A permanent injunction was issued on March 9, 2004.  Pursuant

23  to the injunction, defendants were ordered to serve adult parolees

24  with, inter alia: (1) notice of charges within three business days

25  of the placement of a parole hold (2) the right to counsel in

26  probable cause and parole revocation and hearings (3) a preliminary

1 | hearing to determine good cause for detention within ten business
2 | days after the deadline for notice and (4) a final revocation
3 | hearing within 35 days of the hold, at which adult parolees can
4 | present and cross-examine witnesses and offer documentary evidence.

5 | Although not related by order of the court, there is a second
6 | case which is also related to the pending suit. In Armstrong v.
7 | Davis, No. C-94-2307 (N.D. Cal. 2001), plaintiffs are adult
8 | prisoners and parolees with disabilities. A revised permanent
9 | injunction was issued on February 11, 2002. The injunction ordered
10 | that defendants identify, track, and provide reasonable
11 | accommodations to adult parolees with disabilities at parole
12 | proceedings, and required that adult parolees with disabilities
13 | receive access to forms in alternate formats, to equipment and
14 | assistance to effectively communicate, and to a grievance procedure
15 | for processing denials of requests for accommodations.

16 | Plaintiffs assert that since they will remain under DJJ
17 | jurisdiction until the age of 25, they will not receive the
18 | protections that adult parolees receive under Armstrong or
19 | Valdivia.

20 | **II.**

21 | **ANALYSIS**

22 | **A.   STANDING**

23 | Defendants move to dismiss on the grounds that plaintiffs have
24 | failed to demonstrate standing to sue for equitable relief.
25 | Defendants assert that since the plaintiffs are on parole, they are
26 | not subject to defendants' patterns and practices relating to

1  parole revocation.  It is pure speculation, defendants argue, that

2  plaintiffs will be subjected to parole revocation proceedings.

3  Accordingly, plaintiffs have no standing under Article III.  For

4  the reasons discussed below, the court cannot agree.

5      **1.   Applicable Law**

6      On a motion to dismiss, the allegations of the complaint must

7  be accepted as true.  <u>Takhar v. Kessler</u>, 76 F.3d 995, 1000 (9th

8  Cir. 1996), quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975).  The

9  court is bound to give plaintiffs the benefit of every reasonable

10 inference to be drawn from the "well-pleaded" allegations of the

11 complaint.  <u>Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v.</u>

12 <u>Schermerhorn</u>, 373 U.S. 746, 753 n.6 (1963).  Thus, plaintiff need

13 not necessarily plead a particular fact if that fact is a

14 reasonable inference from facts properly alleged. <u>See</u> <u>id</u>.; <u>see also</u>

15 <u>Wheeldin v. Wheeler</u>, 373 U.S. 647, 648 (1963)(inferring fact from

16 allegations of complaint).

17     To establish standing, plaintiffs must demonstrate that they

18 have:

19          (1) suffered an "injury in fact" that is (a) concrete
            and particularized and (b) actual or imminent, not
20          conjectural or hypothetical; (2) the injury is fairly
            traceable to the challenged action of the defendant; and
21          (3) it is likely, as opposed to merely speculative, that
            the injury will be redressed by a favorable decision.
22

23 <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.</u>,

24 528 U.S. 167, 181(2000).  These requirements together constitute

25 the "irreducible constitutional minimum" of standing. <u>Lujan v.</u>

26 <u>Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  The party

1  invoking federal jurisdiction bears the burden of establishing
2  these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).
3  "At the pleading stage, general factual allegations of injury
4  resulting from the defendant's conduct may suffice, for on a motion
5  to dismiss we presume that general allegations embrace those
6  specific facts that are necessary to support the claim." Lujan, 504
7  U.S. at 561 (internal citations and quotation marks omitted).

8      In class action suits, the named plaintiffs must also have
9  standing when the class is certified. Sosna v. Iowa, 419 U.S. 393,
10 403 (1975). The named plaintiffs must be a "member of the class
11 which he or she seeks to represent at the time the class action is
12 certified by the district court." Id. Since the class in this
13 case has not yet been certified, the court analyzes the standing
14 of the named plaintiffs and not the class as a whole. See Nelsen
15 v. King County, 895 F.2d 1248, 1255 (9th Cir. 1990).

16     In the case at bar, the parties do not dispute the last two
17 standing requirements – causal connection and redresability.
18 Accordingly, the court will confine its analysis to the question
19 of injury.

20     **2.   Injury In Fact**

21     In order to enjoy standing, plaintiffs must plead an actual
22 or imminent injury; "speculative" injuries are insufficient to
23 confer standing. Lujan, 504 U.S. at 561. Moreover, where, as
24 here, plaintiffs seek prospective injunctive relief, they must also
25 demonstrate "that he is realistically threatened by a repetition
26 of [the violation]." Los Angeles v. Lyons, 461 U.S. 95, 109

11

1 (1983)(holding that plaintiff cannot establish the requisite type

2 of harm simply by pointing to some past injury).  The Ninth Circuit

3 has characterized this additional showing as the "realistic

4 repetition" requirement.  <u>Armstrong v. Davis</u>, 275 F.3d 849, 861

5 (9th Cir. 2001).

6     Plaintiffs may demonstrate that the harm is capable of

7 realistic repetition when the harm is part of a "pattern of

8 officially sanctioned. . . behavior, violative of the plaintiffs'

9 [federal] rights." <u>LaDuke v. Nelson</u>, 762 F.2d 1318, 1323 (9th Cir.

10 1985).  As the Ninth Circuit explains, "where the defendants have

11 repeatedly engaged in the injurious acts in the past, there is a

12 sufficient possibility that they will engage in them in the near

13 future to satisfy the 'realistic repetition' requirement."

14 <u>Armstrong</u>, 275 F.3d at 861.  When a named plaintiff asserts that

15 injuries have been inflicted upon a class of plaintiffs, the court

16 may consider the harm asserted by the class to determine if there

17 is a credible threat that the named plaintiff's injury will recur.

18 <u>Id.</u> citing <u>LaDuke</u>, 762 F.2d at 1326.   In <u>Armstrong</u>, the court

19 explained:

20       Where a court, through its specific factual findings,
      documents the threat of future harm to the plaintiff class
21       and establishes that the named plaintiffs (or some subset
      thereof sufficient to confer standing on the class as a
22       whole) are personally subject to that harm, the "possibility
      of recurring injury ceases to be speculative," and standing
23       is appropriate.

24 <u>Armstrong</u>, 275 F.3d at 861 (internal citations omitted).

25       **a.   Threat of Future Harm**

26

1    In the case at bar, the named plaintiffs have demonstrated

2  that they are realistically threatened by future harm.   As in both

3  Valdivia (to which this case is related) and Armstrong, the

4  plaintiffs here base their standing on the "threat of future injury

5  from a systemically defective parole revocation procedure."

6  Valdivia v. Schwarzenegger, No. Civ. S-94-0671 LKK/GGH (E.D. Cal.

7  order issued Dec. 1, 1994)("Valdivia Order").

8    As in Valdivia, qualitative indicators are one factor the

9  court considers in its analysis of the likelihood of future injury.

10 See Valdivia Order at 8.   See also Armstrong, 275 F.3d at 861

11 (court may look at harm asserted by class as a whole). Plaintiffs

12 allege that juvenile parolees in California have an extremely high

13 recidivism rate.   Approximately 70% of juvenile parolees are

14 arrested within 36 months of release.   FAC ¶ 3.

15    Many of the returns to custody are for technical violations.

16 Statistics from the California Department of Corrections and

17 Rehabilitation's Division of Juvenile Justice report that, of 3,599

18 parole violation actions handled in 2005, 490 were for being absent

19 without leave (AWOL), and of those, 132 (27.0%) resulted in

20 revocation or recommitment; 1,415 were for other technical

21 violations, and of those, 1,135 (80%) resulted in revocation or

22 recommitment; 238 were for law violations in which the person was

23 not prosecuted or found not guilty, and of those, 94 (39.5%)

24 resulted in revocation or recommitment.   Id.

25    As this court remarked in Valdivia,

26    [t]hese statistics illustrate the unique degree to which

13

parolees are subject to the challenged revocation procedures. Parolees are, by definition, already subject to defendants' oversight and control. Consequently, they are far more likely to experience recurrent injuries than are plaintiffs who have attempted to challenge practices that only randomly affect members of the general public.

Valdivia Order at 8. For the same reasons, the named plaintiffs in the case at bar are likely to experience recurrent injuries.

Moreover, characteristics unique to juvenile parolees make it more likely that they will face parole revocation proceedings in the future. In their complaint, plaintiffs assert that juvenile parolees demonstrate limited cognitive and emotional development, as well as significant rates of educational deficiencies. See FAC ¶ 5-9. Plaintiffs also maintain that the incidences of serious mental health and learning disabilities for juvenile parolees is far higher as compared to the general public. See FAC ¶ 9-10. Plaintiffs purport that in California, as many as half of the wards in DJJ custody have mental, emotional, or learning disabilities. Approximately 25 % of all wards within DJJ are registered with Special Education and assigned individualized education plans. FAC ¶ 11. These factors suggest that juvenile parolees are uniquely vulnerable to violating their parole and being subject to the complained of practices.

In Armstrong, the court was faced with very similar facts and found that "a person with disabilities is more likely to be suspected of conduct that results in the revocation of parole than other parolees." The court concluded:

It is therefore likely that these individuals will have

difficulty interacting with the personnel who supervise their parole, explaining any innocent but non-conforming behavior, and showing remorse for otherwise minor infractions of the conditions of their parole that do not rise to the level of unlawful conduct. These problems make it more likely that such parolees will be subjected to the parole revocation process, even though they have not committed any unlawful act or violated any condition of their parole.

Armstrong, 275 F.3d at 867.  The same logic applies to the case at bar.

Juvenile parolees' relationship to the parole system is comparable to the relationship between plaintiffs and defendants in R.G. v. Koller, 415 F. Supp. 2d 1129 (D. Haw. 2006).  There, three gay and lesbian youth sued the Hawaii Youth Corrections Facility for discriminatory practices.  Although the three plaintiffs were not incarcerated at the time they filed their complaint, the court held that plaintiffs had standing to seek prospective injunctive relief.  Relying in part on a statistic that 82.2% of wards in Hawaii are rearrested after released on parole, the court held that this type of statistical evidence made it "neither remote nor speculative" that plaintiffs would return to the facility.  Id. at 1136-37.

The personal experience of the named plaintiffs also suggest that the complained of injury will reoccur.  At the time the First Amended Complaint was filed, one of the plaintiffs, A.Z. had already been through three parole revocation proceedings.  FAC ¶ 76.  Plaintiffs state that since the First Amended Complaint was filed, A.Z. has been again subjected to parole revocation proceedings on two separate occasions, and D.R. on one occasion.

1    As in Valdivia, "these prior injuries serve as evidence that the

2    future threat is likely to actually occur." Valdivia Order at 10.

3    See also Lyons, 461 U.S. at 102 (noting that past wrongs are

4    evidence "bearing on whether there is a real and immediate threat

5    of repeated injury"; Kolender v. Lawson, 461 U.S. 352, 357 n.3

6    (1983) (finding a "credible threat" of future injury in part based

7    on plaintiffs' past experiences with defendants' conduct).

8         Additionally, plaintiffs L.H and D.K. are substance abusers.

9    Like two of the named plaintiffs in Valdivia, L.H.'s and D.K.'s

10   problems with alcohol and drugs contributed to their exposure to

11   parole revocation proceedings. As this court observed in Valdivia,

12   alcohol or drug-related parole violations could again "catalyze the

13   revocation process." Valdivia Order at 10. The same logic applies

14   here. Given L.H.'s and D.K.'s problems, there is a high likelihood

15   that they will continue to face parole revocation proceedings.

16        Defendants argue that the "possibility of plaintiffs being

17   subjected to future parole revocation hearings is uniquely within

18   their control." Defs.' Mot. to Dismiss at 12. This argument has

19   been squarely rejected by this court and the Ninth Circuit. In

20   Armstrong, the Ninth Circuit found that adult parolee plaintiffs

21   could not control whether they would be injured again by the

22   defendants' illegal conduct because parolees can be subject to

23   revocation proceedings at any time without engaging in unlawful

24   conduct. Id. at 866. The court explained:

25        The [parole] Board is not required to establish probable
          cause to begin the parole revocation process, nor is it
26        necessary that any law enforcement officer observe the

1   alleged violation, the Board may start parole revocation
2   proceedings when a rather low level of suspicion arises as
    the result of "some minimal inquiry" into the facts of the
3   case.

4   Id. This court's order in Valdivia also rejected the very argument

5   defendants now raises.  This court concluded that "parolees are,

6   by definition, already subject to defendants' oversight and

7   control." Valdivia Order at 9.  See also R.G. v. Koller, 415 F.

8   Supp. 2d at 1137 (rejecting defendants argument the plaintiffs do

9   not have standing because they will only return to custody if they

10  violate the law).

11       For the reasons explained above, both Valdivia and Armstrong

12  are on point and instructive.  Juvenile parolees, like adult

13  parolees and adult parolees with disabilities, continue to face the

14  real risk of future injury based on their status as parolees.

15  There is no reason for the court to now second guess either its own

16  prior order, or the decision of the Ninth Circuit.

17       **b.   Actual Injury**

18       Plaintiffs have presented sufficient allegations of actual

19  injury to confer standing.  Lujan, 504 U.S. at 561.  Plaintiffs

20  allege they are injured by defendants' policies and practices

21  regarding parole revocation.  The named plaintiffs have alleged

22  that defendants have violated their constitutional rights in

23  several ways: (1) failing to provide preliminary hearings to

24  determine whether there is probable cause to believe there has been

25  a parole violation, FAC ¶ 28 (2) failing to provide or allow for

26  assistance of counsel when required by law, id. at ¶ 51-61 (3)

                                    17

failing to allow parolees an opportunity to confront witnesses or present evidence, id. at ¶ 33-38, 50 and (4) failing to hold final parole revocation proceedings within a reasonable time, id. at ¶ 32.

This alleged treatment is sufficient to constitute an actual injury. See Armstrong at 865. As in Armstrong, the consequences of the defendants' alleged unlawful actions is that plaintiffs have been unable to meaningfully participate in the parole process. This constitutes actual injury. Id.

In light of plaintiffs' status as parolees, their ongoing supervision by defendants, their high recidivism rate, their allegations of past injury, and the specific experiences of the named plaintiffs, the threat of parole revocation is sufficiently real and imminent to satisfy the Article III injury requirement.

**B.   CLASS CERTIFICATION**

Plaintiffs move for class certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. The proposed class consists of juvenile parolees in or under the jurisdiction of California, including all juvenile parolees with disabilities as that term is defined in Section 504 of the Rehabilitation Act and the ADA, who are: (i) in the community under parole supervision or who are at large (ii) in custody in California as alleged parole violators, and who are awaiting revocation of their parole or (iii) in custody, having been found in violation of parole and returned to custody. See FAC ¶ 105.

**1.   Applicable Law**

1       A party seeking to certify a class must demonstrate that it

2   has met all four requirements of Rule 23(a) and at least one of the

3   requirements of Rule 23(b).   <u>Zinser v. Accufix Research Inst.,</u>

4   <u>Inc.</u>, 253 F.3d 1180, 1186 (9th Cir. 2001).

5       Rule 23(a) allows a class to be certified:

6           only if (1) the class is so numerous that joinder of all
            members is impracticable, (2) there are questions of law or
7           fact common to the class, (3) the claims or defenses of the
            representative parties are typical of the claims or defenses
8           of the class, and (4) the representative parties will fairly
            and adequately protect the interests of the class.
9
10  Fed. R. Civ. P. 23(a).   In other words, the class must satisfy the

11  requirements of numerosity, commonality, typicality, and adequacy.

12      Rule 23(b) provides for three types of class actions.   Fed.

13  R. Civ. P. 23(b).   Plaintiffs here seek to certify the class under

14  Rule 23(b)(2), which allows a class to be certified if "the party

15  opposing the class has acted or refused to act on grounds generally

16  applicable to the class, thereby making appropriate final

17  injunctive relief or corresponding declaratory relief with respect

18  to the class as a whole."   Fed. R. Civ. P. 23(b)(2).

19      This court must conduct a "rigorous analysis" of the moving

20  party's claims to examine whether the requirements are satisfied,

21  <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 161 (1982).   The

22  court is "at liberty" to consider evidence that relates to the

23  merits, if such evidence also goes to the requirements of Rule 23.

24  <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992).

25  However, the court may not consider whether the party seeking class

26  certification has stated a cause of action or is likely to prevail

1  on the merits, <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178

2  (1974).  If the court concludes that the moving party has met its

3  burden of proof, then the court has broad discretion to certify the

4  class.  <u>Zinser</u>, 253 F.3d at 1186.

5       **2.   Numerosity**

6       Rule 23(a) allows a class to be certified only if the "the

7  class is so numerous that joinder of all members is impracticable."

8  Fed. R. Civ. P. 23(a).  The numerosity requirement does not require

9  that joinder of all members be impossible, but only that joinder

10  be impracticable.  <u>Arnold v. United Artists Theatre Circuit, Inc.</u>,

11  158 F.R.D. 439, 448 (N.D. Cal. 1994).  Moreover, plaintiffs need

12  not state the exact number of potential class members, nor is a

13  specific number of class members required for numerosity.  <u>Arnold</u>,

14  158 F.R.D. at 448.  Whether joinder is impracticable depends on the

15  facts and circumstances of each case.  <u>Id.</u>

16       When the number of proposed class members does not, on its

17  own, satisfy the numerosity requirement, the court may consider

18  other factors such as the geographical diversity of class members,

19  the ability of individual claimants to institute separate suits,

20  and whether injunctive or declaratory relief is sought.  <u>Jordan v.</u>

21  <u>Los Angeles County</u>, 669 F.2d 1311, 1319 (9th.  Cir. 1982) (vacated

22  on other grounds by 459 U.S. 810 (1982)).

23       In the case at bar, plaintiffs assert that the proposed class

24  includes over 4,000 individuals.  "This number includes juvenile

25  parolees who have been or are at imminent risk of being wrongfully

26  and unconstitutionally deprived of their liberty in connection with

1   the revoking, subsequent granting, and extending of their parole."
2   Pls. Mot. for Class Cert. at 8. Defendants do not contest that
3   plaintiffs have satisfied this requirement as to their
4   constitutional claims. Defendants do, however, argue that
5   plaintiffs do not meet the numerosity requirement with respect to
6   plaintiffs' ADA and Section 504 claims. Defendant avers that there
7   is no specific allegation regarding the number of juveniles who are
8   in danger of having their rights under the ADA and Section 504
9   violated. The court cannot agree.

10       Plaintiffs' complaint sets forth sufficient allegations to
11  suggest that, among the 4,000 juvenile parolees, many have
12  disabilities.[1] Plaintiffs assert that one U.S. Department of
13  Justice Survey found learning disabilities in nearly 50% of
14  juveniles in custody. See FAC ¶ 10. Plaintiff also asserts that
15  in California as many as half of the wards in DJJ custody have
16  mental, emotional or learning disabilities. Approximately 25% of
17  all wards are registered with Special Education and assigned
18  individualized treatment plans. FAC ¶ 11.[2]

19  ────────────────────

20       [1]   The ADA defines disability as: (a) a physical or mental
     impairment that substantially limits one or more of the major life
21  activities of such individual;(b) a record of such an impairment;
     or (c) being regarded as having such an impairment. 42 U.S.C.A.
22  § 12102 (2).

23       [2]   The court notes that these numbers do not specifically
     establish the exact number of juvenile parolees in California who
24  are disabled. However, it is not necessary that evidence of the
     class size be exact. A reasonable estimate of the class size,
25  based on common sense assumptions of numerosity, is sufficient.
     See Arnold, 158 F.R.D. at 448; Civic Ass'n of Deaf of New York
26  City, Inc. v. Giuliani, 915 F. Supp. 622, 632 (S.D.N.Y. 1996)
     ("[P]recise quantification of the class members is not necessary

1    Although  the allegations in the complaint must be taken as
2    true for the purposes of class certification, <u>Blackie v. Barrack</u>,
3    524 F.2d 891, 901 n. 17 (9th. Cir. 1975), the court is "at liberty"
4    to consider evidence that relates to the merits if such evidence
5    also goes to the requirements of Rule 23, <u>Hanon</u>, 976 F.2d at 508.
6    Here, plaintiffs submitted evidence in the form of a report
7    entitled, "Identifying Mental Health Treatment Needs Amount Serious
8    Institutilized  Delinquents  Using  Paper  and  Pencil  Screening
9    Instruments: Finial Report to the National Institute of Justice"
10   (2003).  The report found that the prevalence of diagnosable mental
11   disorders among incarcerated juvenile populations is as "as high
12   as 60-70 %."  <u>See</u> Reply Decl. of Kirsten A.  Palumbo, Ex. A at 1.

13       The very nature of the allegations also suggests that joinder
14   is  impracticable.  According  to  plaintiffs'  allegations,
15   deficiencies in DJJ make it difficult, if not impossible, to
16   identify  and  track  the  number  of  juvenile  parolees  with
17   disabilities.  Given the difficulty in even identifying disabled
18   plaintiffs, joiner would be impracticable if not impossible.

19       Other courts have similarly found that joinder is impractical
20   where it is difficult to identify the members of the proposed
21   class.  <u>See</u>, <u>e.g.</u>, <u>Phillips v. Joint Legislative Comm.</u>, 637 F.2d
22   1014, 1022 (5th Cir. 1981) (numerosity found in race discrimination

23   _____

24   because the court may make 'common sense assumptions' to support
     a finding of numerosity."); <u>Retired Chicago Police Ass'n v. City</u>
25   <u>of Chicago</u>, 141 F.R.D. 477, 484-85 (N.D. Ill. 1992) (numerosity
     finding may be based on common sense assumptions), aff'd in part,
26   rev'd in part on other grounds, 7 F.3d 584 (7th Cir. 1993)

suit where neither party could count or identify class members, as defendant-employer did not track applicants' race); Israel v. Avis Rent-A-Car Sys., Inc., 185 F.R.D. 372, 378 (S.D. Fla. 1999) (numerosity found where identifying class members was difficult because much of information was within defendant's control), rev'd on other grounds, 211 F.3d 1228 (11th Cir. 2000).

For these reasons, the court concludes that joinder of the class members would be impracticable. Plaintiffs have satisfied the numerosity requirement.

### 3. Common Issue of Law or Fact

The commonality requirement is met if "plaintiffs' grievances share a common question of law or of fact." Armstrong, 275 F.3d at 868. It is well established that "all questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient . . ." Hanlon, 150 F.3d at 1019.

In civil-rights suits the commonality requirement "is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." Armstrong at 868, citing LaDuke, 762 F.2d at 1332.

In the case at bar, the common issue raised by plaintiffs is whether "defendants' policies, procedures and practices violate [plaintiffs'] constitutional and statuary rights in parole proceedings." Pls. Mot. for Class Cert. at 10. Plaintiffs allege that defendants defective practices affect all of the putative class members.

1    Defendants contend that the commonality requirement cannot be

2  met with respect to plaintiffs' disability claims.   Defendants

3  assert:

4         Because of the uncertainty of the number of qualified
          individuals with disabilities, the case-by-case review of
5         records and files necessary to determine if a plaintiff is a
          qualified individual with disability, and the individualized
6         nature of the relief that may be required, certification of
          the Plaintiffs' disability claims in the present case should
7         also be denied.

8
9  Defs.' Oppo. to Pls. Mot. at 12-13.   This argument has been

   squarely rejected by the Ninth Circuit.   In <u>Armstrong</u>, defendants
10
   argued that "a wide variation in the nature of the particular class
11
   members' disabilities precludes a finding of commonality."
12
   <u>Armstrong</u>, 275 F.3d at 868.   The court rejected this argument,
13
   holding instead that, "in a civil-rights suit, that commonality is
14
   satisfied where the lawsuit challenges a system-wide practice or
15
   policy that affects all of the putative class members."   <u>Id.</u>
16
   The court went on to explain that:
17

18        In such circumstance, individual factual differences among
          the individual litigants or groups of litigants will not
19        preclude a finding of commonality . . . Certainly, the
          differences that exist here do not justify requiring groups
20        of persons with different disabilities, all of whom suffer
          similar harm from the Board's failure to accommodate their
21        disabilities, to prosecute separate actions. The commonality
          requirement is met.
22

23 <u>Id.</u>   The reasoning of <u>Armstrong</u> applies with equal force to the

24 case at bar.   Here, as in <u>Armstrong</u>, disabled plaintiffs are

25 challenging practices which prevent them from participating

26 meaningfully in the parole process.   The allegations of system wide

deficience affects all of the putative class members with disabilities, regardless of the specific nature of their individual disability.

For these reasons, the court finds that plaintiffs have satisfied the commonality requirement.

### 4. Typicality

The typicality requirement of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires that "the claims of the class representatives be typical of those of the class, and to be 'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Armstrong, 275 at 868 (citing Marisol v. Giuliani, 126 F.3d 372, 376 (2nd Cir. 1997)). Moreover, the typicality requirement may be satisfied if "all the members of the purported class would be benefitted by the suit plaintiffs seek to bring." Ellis v. Naval Air Rework Facility, Alameda, Cal., 404 F. Supp. 391, 396 (N.D. Cal. 1975).

In the case at bar, plaintiffs satisfy the typicality requirement. As previously discussed, the deprivations complained of by plaintiffs affect the entire plaintiffs class. Minor differences among the class are inconsequential. See Armstrong. Moreover, plaintiffs assert a common claim, namely, that the current parole process violates constitutional and statutory rights.

1    Defendants assert that L.H. and D.K. are not in fact disabled
2    and therefore neither of these plaintiffs meet the typicality
3    requirement.  See Defs.' Oppo to Pls.' Mot. for Class Cert. at 11.
4    In support of this assertion, defendants attached excerpts from
5    L.H.'s and D.K.'s files.  Defendants maintain that these excerpts
6    demonstrate that the two plaintiffs are not, in fact, disabled.
7    For example, defendants point to certain records which document
8    that D.K. "completed all proficiency tests in math, reading, and
9    writing in order to take his G.E.D." Defs.' Oppo. at 10.  Based
10   on these records and others, defendants conclude that D.K is not
11   disabled.

12    With respect to L.H., defendants identify certain records and
13   conclude that although L.H. had "early educational problems . . .
14   these problems appear to be due to habitual truancy rather than any
15   developmental disability." Id. at 10.  In light of the assertion
16   that neither of these named plaintiffs are disabled, defendants
17   maintain that the typicality requirement is not met.  The court
18   must reject defendants' position.  As the Ninth Circuit recently
19   reiterated, "arguments evaluating the weight of evidence or the
20   merits of a case are improper at the class certification stage."
21   Dukes v. Wal-Mart, Inc., 474 F. 3d 1214 at 6 (9th Cir. 2007),
22   citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).

23    In Blackie v. Barrack, the Ninth Circuit set forth the
24   applicable standard to apply in this circumstance:

25        The court is bound to take the substantive allegations of the
         complaint as true, thus necessarily making the class order
26        speculative in the sense that the plaintiff may be altogether

26

unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements.

524 F.2d 891, 901 (9th Cir. 1975). See also Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 231 (C.D. Cal. 2003). In Blackie, the court concluded that the lower court judge had,

analyzed the allegations of the complaint . . . and the other material before him (material sufficient to form a reasonable judgment on each requirement), considered the nature and range of proof necessary to establish those allegations, determined as best he was able the future course of the litigation, and then determined that the requirements were met at that time. . . That is all that is required.

Blackie, 524 F.2d at 900-01. In short, at the class certification stage, plaintiffs need only provide sufficient information for the court to form a reasonable judgment about whether plaintiffs' claims are typical.   Id.

In examining the allegations set forth in the complaint, as well as the evidence submitted by both plaintiffs and defendants, the court finds that there is sufficient information to conclude that plaintiffs' claims are typical of the class.[3]

L.H. maintains that he has needed special education since

_____

[3] The court also notes in passing that even if it were appropriate for the court to decide whether plaintiffs are disabled, the evidence submitted by defendants is inconclusive. The excerpts of plaintiffs' records which were submitted by defendants reveal that both L.H. and D.K. have problems. Neither the defendants, nor the court, is in a position to render an expert opinion as to whether or not these problems are related to disabilities. The records submitted by defendants fail to demonstrate that L.H. and D.K. are not disabled; instead, it simply reveals that these youths have problems.

1  childhood and requires assistance with reading. FAC ¶ 74.

2  According to the complaint, L.H. suffered from developmental delays

3  attributable to premature birth and a head injury during childhood.

4  Without passing judgment on whether L.H. is in fact disabled, the

5  court finds that the evidence submitted by plaintiffs supports the

6  allegations. The records filed under seal by plaintiffs reveal

7  that L.H. has a learning disability and received special education.

8  See Reply Decl. of Gay Crosthwait Grunfeld, ¶ 11-14 & Exs. E-H.

9      The complaint also alleges that D.K.'s DJJ file contained

10  diagnoses of mental disorders. See FAC ¶ 82. The sealed records

11  submitted by plaintiffs confirm that D.K. has been diagnosed with

12  mental disorders while in DJJ/CYA custody. See Reply Decl. of Gay

13  Crosthwait Grunfeld, Ex. D. Again, without deciding whether or not

14  D.K. is in fact disabled, the court concludes that plaintiffs have

15  submitted sufficient information so as to meet the typicality

16  requirement of Rule 23.

17      Moreover, part of plaintiffs' allegation is that defendants

18  fail to properly identify, document, and treat juvenile parolees

19  with disabilities. See FAC ¶ 148 ("In violation of Section 504 and

20  the ADA, defendants have failed to develop adequate policies and

21  practices that enable them to identify, assess or reasonably

22  accommodate juvenile parolees with disabilities"). For example,

23  plaintiffs aver that the Individualized Education Plan ("IEP") and

24  school records for L.H. are missing from his central file despite

25  several references to the existence of these documents elsewhere

26  in his file. See Grunfeld Decl., ¶ 15-16 & Ex. I. For the reasons

1  explained,  the  court  finds  that  plaintiffs  have  provided
2  "sufficient information to form a reasonable judgment" that the
3  typicality requirement is met.  See Blackie at 901.

4      **5.   Adequacy of Representation**

5      The  fourth  and  final  Rule  23(a)  requirement - adequacy -
6  requires: (1) that the class representatives and class counsel not
7  have  conflicts  of  interest  with  the  class  and  (2)  that  the  class
8  be represented by qualified counsel who will vigorously prosecute
9  the case on behalf of the class.  Hanlon, 150 F.3d at 1020.

10     With respect to the first part of the requirement, the named
11 plaintiffs'  interests  are  aligned  with  those  of  the  class  as  a
12 whole.   The  same  is  true  for  plaintiffs'  counsel.   Moreover,
13 neither party has altered the court as to any potential conflict
14 of interest.

15     Defendants  do,  however,  argue  that  D.K.  is  not  a  proper
16 representative since he no longer resides in California.  See Defs.
17 Oppo. at 13.  Plaintiffs concede that D.K. does presently live in
18 Kansas.   However,  according  to  the  Interstate  Compact  and  its
19 Rules, California retains authority to revoke parole.  See Palumbo
20 Decl., Ex. C at § 3.3.5 (Interstate Compact Bench Book for Judges
21 and Court Personnel).  In fact, the receiving state (Kansas) cannot
22 revoke D.K.'s parole.  Id.  Only California can. Id.  Accordingly,
23 D.K. continues to share interests with the class.[4]

24 _____

25     [4] The  proposed  class  is  defined  as  those  juveniles  who  are:
   (i) in the community under parole supervision or who are at large;
26 (ii) in custody in California as alleged parole violators, and who
   are  awaiting  revocation  of  their  parole;  or  (iii)   in  custody,

29

1    Defendants do not dispute that the class will be represented

2    by qualified counsel who will vigorously prosecute the case on

3    behalf of the class.  <u>Hanlon</u>, 150 F.3d at 1020.  The court finds

4    that the law firms representing plaintiffs are competent and

5    experienced.  All three firms have had cases before this court on

6    prior occasions.  The court has observed first hand the high level

7    of competence exhibited by plaintiffs' counsel.

8    For these reasons, the court finds that plaintiffs have

9    satisfied the adequacy of representation requirement of Rule 23.

10   **6.    Rule 23(b) Criteria**

11   The plaintiff class must also satisfy one of the requirements

12   of Rule 23(b).  Here, plaintiffs seek certification pursuant Rule

13   23(b)(2), which applies where a defendant "has acted or refused to

14   act on grounds generally applicable to the class, thereby making

15   appropriate final injunctive relief or corresponding declaratory

16   relief with respect to the class as a whole." Fed. R. Civ. P.

17   23(b)(2).  For a class to be certified under this section, "[i]t

18   is sufficient if class members complain of a pattern or practice

19   that is generally applicable to the class as a whole," even if not

20   all class members have been injured by the challenged practice.

21   <u>Walters v. Reno</u>, 145 F.3d 1032, 1047 (9th Cir. 1998).

22   For all the reasons previously discussed, it is evident that

23   the class members complain of a pattern and practice that applies

24   _____

25   having been found in violation of parole and returned to custody.
     <u>See</u>  FAC ¶ 105.

26

1  to the class as a whole, namely, the parole revocation proceedings.

2  Accordingly, plaintiffs have satisfied the requirements of Rule

3  23(b).

4      With good cause appearing for all of the reasons discussed

5  above, plaintiffs' motion for class certification is granted.

6  Accordingly, the court certifies the following class for all claims

7  raised in plaintiffs' first amended complaint:  juvenile parolees

8  in or under the jurisdiction of California, including all juvenile

9  parolees with disabilities as that term is defined in Section 504

10 of the Rehabilitation Act and the ADA, who are: (i) in the

11 community under parole supervision or who are at large; (ii) in

12 custody in California as alleged parole violators, and who are

13 awaiting revocation of their parole; or (iii) in custody, having

14 been found in violation of parole and returned to custody. FAC ¶

15 105.

16 **C.   USE OF PLAINTIFF'S FULL NAMES**

17      The parties disagree on whether plaintiffs may proceed in

18 pseudonym, without identifying themselves in court papers.  In the

19 interest of moving the case forward, the parties initially

20 stipulated to allow plaintiffs to temporarily proceed in pseudonym.

21 See November 14, 2006 stipulation and order.  Defendants now move

22 to use plaintiffs' full names.  Defendants argue that plaintiffs

23 have little interest in proceeding anonymously, particularly when

24 weighed against the prejudice defendants would face and the

25 public's interest in full disclosure.  For the reasons discussed

26 below, the court disagrees.

1    **1.   Applicable Law**

2        In general, all parties to a suit must include their full

3    names on the face of the complaint. Fed. R. Civ. P. 10(a)(stating

4    that the complaint "shall include the names of all the parties").

5    Under this rule and the cases interpreting it, there is no express

6    right to conceal names.   Doe v. Rotsker, 89 F.R.D. 159, 161 (D.

7    Cal. 1981).   However, where a party can show a substantial privacy

8    interest that outweighs the presumption of openness, the party may

9    proceed with anonymity.   Id.

10       In Does I thru XXIII v. Advanced Textile Corp., 214 F.3d 1058

11   (9th Cir. 2000), the Ninth Circuit sets the controlling legal

12   standard for "a district court's discretionary decision to permit

13   a party to proceed anonymously." Id. at 1968.   The court explains

14   that "a party may preserve his or her anonymity in judicial

15   proceedings in special circumstances when the party's need for

16   anonymity outweighs prejudice to the opposing party and the

17   public's interest in knowing the party's identity." Id.   The Ninth

18   Circuit identified three circumstances in which anonymity is

19   appropriate, two of which are relevant here: (1) when use of a

20   party's real name creates a risk of "retaliatory physical or mental

21   harm" against the party; and (2) when anonymity is necessary to

22   preserve privacy in a sensitive and highly personal matter. Id.

23   Several factors are considered in evaluating a plaintiff's interest

24   in proceeding anonymously: (1) the severity of the threatened harm,

25   (2) the reasonableness of plaintiffs' fears, and (3) the

26   plaintiffs' particular vulnerability. Id.   at 1068.   The court

1  addresses each element in turn.

2      **2.   The Severity of the Threatened Harm**

3      A severe harm falls somewhere between social stigma, <u>Rotsker</u>,

4  89 F.R.D. 159 (holding that professional embarrassment did not

5  amount to severe harm), and the combination of job loss,

6  deportation, and reprisals against family members, <u>Advanced</u>

7  <u>Textile</u>, 214 F.3d 1058.  In <u>Advanced Textile</u>, the court considered

8  the threatened harm to be severe because, as non-resident workers

9  in Saipan, plaintiffs were susceptible to deportation and economic

10  harm if they lost their jobs in retaliation for the lawsuit. <u>Id.</u>

11  at 1071.

12      In the case at bar, it is evident that the threatened harm

13  faced by plaintiffs is severe.  Should plaintiffs' names be

14  revealed, plaintiffs allege that they will face "retaliatory acts

15  including physical harm, denial of privileges, groundless

16  revocation of parole, addition of time to their sentences, denial

17  of necessary medical or mental health treatment, denial of

18  educational opportunities, and housing placements that expose them

19  to the threat of harm."  Pls.' Opp'n to Defs.'  Mot.  at 5.

20      Defendants argue that the severity of threatened harm is low

21  because the only harm is parole revocation.  The court cannot

22  agree.  The groundless revocation of parole is very much a severe

23  harm as it necessarily implicates, inter alia, parolees' liberty

24  interests.  Moreover, a groundless parole revocation exposes a

25  parolee to a host of other possible harms including retaliation.

26  Plaintiff D.K. alleges, "retaliation against wards by CYA/DJJ staff

1   is part of the Youth Authority system." Decl. of D.K. in Oppo. to

2   Defs. Mot.   As D.K. explains, "[t]here is an 'us versus them'

3   mentality and when a ward mentions the lawsuits against the DJJ,

4   such as the Farrell case, or mentions the Prison Law Office, parole

5   agents and correctional officers become very tense and retaliate

6   against wards by giving arbitrary time-adds, putting wards on

7   lookdown and taking away privileges." Id.

8       D.K. maintains that when he pursued a personal injury lawsuit

9   against DJJ and filed grievances against individual DJJ employees,

10  he faced retaliatory actions.  For example, when a guard found out

11  D.K. had filed a grievance against him, the guard began refusing

12  D.K. access to a shower. Id.  Similarly, when D.K. investigated the

13  possibility of a lawsuit against DJJ, custody staff terminated D.K.

14  from his job in landscaping. Id.  DK's time in custody was also

15  extended by six months. Id.  These allegations support plaintiffs'

16  position that the threatened harm is in fact severe.

17      Defendants also argue that, pursuant to the November 14

18  Stipulation and Order, plaintiffs' names have been revealed to

19  defendants so proceeding with anonymity is unnecessary. See, e.g.,

20  Doe v. Hallock, 119 F.R.D. 640, 644 (S.D. Miss. 1987) (holding that

21  there is no need for anonymity when the persons from whom

22  retaliation is feared already know plaintiffs' full names).

23      This argument is equally unavailing.  The stipulation makes

24  clear that knowledge of plaintiffs' identities should be used only

25  to the extent necessary to proceed with the case and only by those

26  parties directly involved.  As such, not all persons from whom

34

retaliation is feared know the plaintiffs' names.  Pursuant to the
stipulation, parole agents, counselors, guards, wardens, or other
employees of DJJ do not - and will not - know plaintiffs' real
names.

In short, plaintiffs have established that there is a threat
of severe harm.

**3.    The Reasonableness of Plaintiffs' Fears**

The second prong of the _Advanced Textile_ test requires that
plaintiffs' fears of threatened retaliation be reasonable.
_Advanced Textile_, 214 F.3d at 1068.  Fear of threatened retaliation
is reasonable if a reasonable person would believe the threat could
be carried out. _Id._ at 1071.  Under this prong, the court considers
whether plaintiffs were actually threatened, and may also consider
evidence of a history of retaliatory practices.   _Id._

As previously discussed, plaintiff D.K. alleges that he was
retaliated against and that there is a culture of retaliation in
the DJJ.  Moreover, the declarations of other persons familiar with
the parole system indicate that retaliation is a common practice
within the system.   _See_ Decl. of Grunfeld in Opp'n to Defs.'
Mot.(stating that ongoing investigation into DJJ practices revealed
retaliatory practices); Decl. of Norman in Opp'n to Defs.'
Mot.(discussing the retaliatory practices that occurred in relation
to _Stevens v. Harper_, No. CIV-S-01-0675 DFL-PAN).  Their claims
indicate that defendants and their employees have the power not
only to threaten retaliation, but also to carry it out.  _Id._  As
such, plaintiffs' fears are reasonable.

35

**4.   The Plaintiffs' Particular Vulnerability**

The Ninth Circuit has explained that when one party is under the control or power of the other party, the former is particularly vulnerable to retaliation.  <u>Advanced Textile</u>, 214 F.3d at 1072 (finding that plaintiffs were subject to the will of the defendants, who could at any time terminate their employment, deport them, and affect their living situations).

Because plaintiffs are on parole and remain wards of the juvenile system, they are subject to the power and control of the defendants.  <u>Id.</u>  Moreover, plaintiffs' status as juveniles make them, in many respects, more vulnerable than adults.  Plaintiffs' complaint sets forth the ways in which juvenile parolees are less educated, less mature and less able to understand the revocation process as compared to adult parolees.  FAC ¶ 2, 5-23.  These age related characteristics make plaintiffs' particularly more vulnerable to threats and retaliatory actions.

Defendants argue that plaintiffs can find recourse within the court system should abuses occur.  This argument is without merit. As the Ninth Circuit explained in <u>Advanced Textile</u>, "[plaintiffs] are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of post hoc remedies." 214 F.3d at 1071.

For these reasons, the court finds that plaintiffs are particularly vulnerable to threats of retaliation from the defendants.  Given that plaintiffs have a substantial interest in proceeding anonymously, the court next addresses the possible

1  prejudice to defendants and the public.

2      **5.   Plaintiffs' Interests Balanced Against Prejudice to**
3          **Defendants and the Public's Interest in Full Disclosure**

4      Plaintiffs' substantial interest in proceeding anonymously
5  must be balanced against any prejudice to the defendant, as well
6  as the public's interest in full disclosure of plaintiffs' names.
7  Advanced Textile, at 1068.  For the reasons set forth below, the
8  court finds that any prejudice to the defendants is minimal and the
9  public's interest in full disclosure is outweighed by the public's
10 interest in cases such as this proceeding on the merits.

11     **a.   Prejudice Against the Defendant**

12     Defendants fail to demonstrate how they will be prejudiced by
13 plaintiffs preceding anonymously.  Pursuant to the November 14
14 stipulation and order, defendants have access to plaintiffs' full
15 names, which they can use to the extent needed to investigate
16 plaintiffs' claims.

17     Defendants claim that they face adverse publicity from the
18 using initials.  They argue that using initials supports the
19 plaintiffs' allegations that DJJ participates in retaliatory
20 practices.  Defendants claim they will be unable to disprove or
21 challenge these allegations without the use of full names.  These
22 arguments are unconvincing.  There is no evidence that revealing
23 the full names to the public will allow defendants to better
24 challenge or disprove the allegations.

25     Because defendants can use the plaintiffs' names to the extent
26 necessary to investigate the claims and there is no evidence to

1 | suggest that using full names would alleviate adverse publicity,

2 | defendants' interest in full disclosure is minimal.

3 | **b. Public Interest in Full Disclosure**

4 | In general, the public has an interest in access to judicial

5 | proceedings, which is supported by the use of full names. <u>Advanced</u>

6 | <u>Textile</u> at 1067. However, when the willingness to file suit is

7 | chilled by fear of retaliatory action, the public interest in

8 | seeing the suit move forward on its merits outweighs the public

9 | interest in knowing the plaintiffs' names. <u>Id.</u> at 1073. A chilling

10 | effect is likely to occur where defendants would be able to exert

11 | leverage over plaintiffs who file suit. <u>See id.</u> at 1073 (discussing

12 | the effects of the employer-employee relationship). Revealing

13 | plaintiffs' full names could have a chilling effect on this case

14 | and others like it. As previously discussed, plaintiffs are

15 | subject to DJJ control and their status as juveniles makes them

16 | uniquely vulnerable. As such, defendants could exert leverage on

17 | plaintiffs should their names be revealed, thereby chilling their

18 | willingness to bring suit. Because the public has an interest in

19 | having this case heard on the merits, anonymity is appropriate.

20 | In balancing the prejudice to defendants against the public's

21 | interest in having the case proceed on the merits, the scale

22 | clearly tips in favor of plaintiffs.[5]

23 | For the reasons discussed herein, the court finds that the

24 |

25 | [5] Plaintiffs also make a compelling argument regarding the sensitivity of the plaintiffs' juvenile records. Because the court finds that anonymity is appropriate under the <u>Advanced Textile</u>

26 | balancing test, the plaintiffs' second argument is not addressed.

1  plaintiffs may move forward using only their initials.
2  Accordingly, defendants' motion to proceed using plaintiffs' full
3  names must be denied.

4  **D.   Motion to Strike**

5  Defendants request that certain "irrelevant and immaterial
6  allegations" be struck from plaintiffs' first amended complaint.
7  Defendants object to allegations regarding conditions of
8  confinement as well as allegations pertaining to certain records.
9  For the reasons discussed herein, defendants' motion to strike must
10  be denied.

11  **1.   Applicable Law**

12  Rule 12(f) provides that a court "may order stricken from any
13  pleading . . . any redundant, immaterial, impertinent, or
14  scandalous matter."  Immaterial matter is that which has "no
15  essential or important relationship to the claim for relief or the
16  defenses being pleaded, or a statement of unnecessary particulars
17  in connection with and descriptive of that which is material." 5
18  Charles A. Wright & Arthur R. Miller, Federal Practice and
19  Procedure § 1382 (2006).  Impertinent matter consists of
20  "statements that do not pertain, and are not necessary, to the
21  issues in question." <u>Id.</u> Finally, scandalous matter is that "which
22  improperly casts a derogatory light on someone, most typically on
23  a party to the action." <u>Id.</u>

24  "[T]he function of a 12(f) motion to strike is to avoid the
25  expenditure of time and money that must arise from litigating
26  spurious issues by dispensing with those issues prior to trial·..."

1  Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.

2  1983).

3      It is well established that "motions to strike should not be

4  granted unless it is clear that the matter to be stricken could

5  have no possible bearing on the subject matter of the litigation."

6  Colaprico v. Sun Microsystems, Inc., 758 F. Supp. 1335, 1339 (N.D.

7  Cal. 1991), see also Neveu v. City of Fresno, 392 F. Supp. 2d 1159,

8  1170 (E.D.Cal. 2005)(J. Wanger).  For this reason, "[m]otions to

9  strike are disfavored and infrequently granted."   Neveu, 392 F.

10 Supp.2d at 1170.

11      **2.   Allegations regarding conditions of confinement**

12      Defendants request that the court strike allegations relating

13 to  general  allegations  regarding  national  and  state-wide

14 characteristics of juveniles and allegations regarding educational,

15 medical, mental health and custody conditions and services at DJJ.

16 See Defs.' Motion to Strike at 16.

17      As evidenced by this court's discussion on standing, the

18 allegations regarding characteristics of juvenile parolees has a

19 direct  connection  to  the  subject  matter  of  this  litigation.

20 Parolees' education, medical and mental health conditions relate

21 to  their  ability  to  fully  participate  in  parole  revocation

22 proceedings.  Similarly, these characteristics are also relevant

23 in determining the need for legal representation.  In Gagnon v.

24 Scarpelli, the Supreme Court specifically observed that in the

25 context  of  parole  revocation  proceedings,  "the  unskilled  or

26 uneducated  probationer  or  parolee  may  well  have  difficulty  in

40

1  presenting his version of a disputed set of facts." <u>Gagnon v.</u>

2  <u>Scarpelli</u>, 411 U.S. 778, 787 (1973).   Accordingly, the Supreme

3  Court held that, "in passing on a request for the appointment of

4  counsel, the responsible agency. . . should consider, especially

5  in doubtful cases, whether the probationer appears to be capable

6  of speaking effectively for himself." <u>Id.</u> at 790-791.  In light

7  of the Supreme Court's clear concern about parolees' ability to

8  represent themselves, the court finds that the characteristics of

9  juvenile parolees very much relevant.

10      Defendants also argue that allegations regarding conditions

11  of confinement are irrelevant and immaterial since they are subject

12  to a consent decree in <u>Farrell v.   Hickman</u>, No.   RG 03079344

13  (Alameda County Super. Ct.  filed Jan. 16, 2003).  Defendants

14  argue that the allegations regarding conditions in DJJ facilities

15  "distracts from the focus of this litigation . . . and allow

16  plaintiffs the opportunity to relitigating [sic] issues that have

17  been resolved by another court." Defs'. Mot.  to Strike at 18.

18      The <u>Farrell</u> case pertains to conditions of confinement in DJJ

19  facilities, including, inter alia, mental health services, medical

20  services, and educational services.[6]  The <u>Farrell</u> case does not

21  address parole or parole revocation proceedings.  While there is

22  some overlap in the types of issues (for example, the prevalence

23  of juveniles with mental health problems), the legal claims in the

24  two cases are completely separate, as are the requested remedies.

25  _____

26      [6] Plaintiffs represent that the <u>Farrel</u> case is in the remedial
    phase.

1  Given that motions to strike are strongly disfavored, the existence

2  of the <u>Farrell</u> case is not a sufficient reason which would justify

3  striking allegations which pertain to conditions of confinement.

4      **3.    Allegations Regarding Public Records**

5      Defendants also move to strike paragraph 24 of plaintiffs'

6  first amended complaint.  The paragraph reads:

7           The process of imposing parole holds and parole
          consideration and revocation for juveniles is an opaque
8           system lacking clear rules or standards to guide staff,
          juvenile parolees, attorneys, and parents.  As
9           demonstrated by defendants' inadequate and confused
          response to a Public Records Act request by plaintiffs'
10          counsel concerning parole procedures, even defendants
          are unable to articulate the way the system is intended
11          to function.

12  First Amended Complaint  ¶ 24.  Defendants contend that the

13  statement is incorrect, inaccurate and has "no place" in the

14  complaint. Defs.' Mot. at 19.  Defendants then proceed to explain

15  the ways in which the records request was misdirected and extremely

16  broad.  Accordingly, defendants maintain that this statement

17  "mischaraterizes" the truth of the circumstances.   <u>Id.</u>

18      Defendants' argument is without merit.  The allegation that

19  defendants cannot articulate how the system is intended to function

20  is clearly related to plaintiffs' more general claims regarding the

21  deficiencies in the parole revocation proceedings.   Determining

22  whether the allegation is a mischaracterization of the facts is a

23  question the court need not address on a motion to strike.

24  Instead, the court need only evaluate whether "it is clear that the

25  matter to be stricken could have no possible bearing on the subject

26  matter of the litigation." <u>Colaprico, Inc.</u>, 758 F. Supp. at 1339.

1  Here, the allegation clearly may bear on the subject matter of the

2  litigation.

3       In sum, defendants have failed to establish that any of the

4  challenged allegations are "redundant, immaterial, impertinent, or

5  scandalous matter." F. R. Civ. P. 12(f).   Accordingly, the court

6  denies defendants' motion to strike.

7                                **III.**

8                             **Conclusion**

9  1.    Defendants' Motion to Dismiss and or Strike is DENIED.

10  2.    Defendants' Motion to use Plaintiffs' Full Names is DENIED.

11  3.    Plaintiffs' Motion for Class Certification is GRANTED.

12       IT IS SO ORDERED.

13       DATED: February 28, 2007.

14

15

16

17                          LAWRENCE K. KARLTON
                            SENIOR JUDGE
18                          UNITED STATES DISTRICT COURT

19

20

21

22

23

24

25

26