# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

L.H, et al.,

      Plaintiffs,

vs.                           `NO.CIV.S-06-2042 LKK/GGH`

ARNOLD SCHWARZENEGGER, et al.,

      Defendants.

_____/

### SECOND REPORT OF THE SPECIAL MASTER
### ON THE STATUS OF
### CONDITIONS OF THE STIPULATED ORDER

#### Background

The Plaintiffs in this case filed their Complaint with the Court on September 13, 2006. The Court certified this case as a class action by Order dated February 28, 2007. The Defendants are state agencies and state officials responsible for the policies, procedures, and practices by which California conducts juvenile parole revocation proceedings, to include: the Board of Parole Hearings, the Division of Juvenile Justice, the Juvenile Parole Board, and the California Department of Corrections and Rehabilitation.

On September 19, 2007, the Court granted partial summary judgment in favor of Plaintiffs, holding that California's juvenile parole revocation system, by failing to provide a timely probable cause hearing, violated the due process rights of the Plaintiff

PDF created with pdfFactory trial version www.pdffactory.com

class as those rights were described in *Morrissey v. Brewer*. On January 29, 2008, the Court held that Defendants' failure to appoint counsel for all juvenile parolees violated the due process rights of the Plaintiff class, according to precedent set in *Gagnon v. Scarpelli*. In the same order, the Court also found that Defendants' policies and practices violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The Court ordered the Defendants to:

(1) begin appointing counsel to represent juvenile parolees at parole revocation hearings no later than February 15, 2008, and to provide that counsel with access to confidential contact space and the necessary files sufficiently in advance of the hearing to allow adequate preparation,

(2) allow parolees to obtain counsel of their own choosing, who shall be able to represent clients under the same terms as appointed counsel, and Defendants are to notify the parolee's counsel of record or public defender when a hold is placed,

(3) ensure effective communication and provide necessary accommodations, and

(4) develop sufficiently specific policies and procedures to ensure continuous compliance with all of the requirements of the American with Disabilities Act during revocation proceedings.

Chase Riveland and Virginia Morrison were appointed as Special Master and Deputy Special Master, respectively, on May 22, 2008. The parties, on June 13, 2008, submitted a Stipulated Motion for Preliminary Approval of Class Settlement. The Court granted the motion on June 17, 2008 and approved a Stipulation and Order for Permanent Injunctive Relief on October 7, 2008 (hereafter "Stipulated Injunction").

PDF created with pdfFactory trial version www.pdffactory.com

## Special Master Activities

The Special Master continued to assist the parties in a variety of negotiations and dispute resolution. The team attended trainings for institutions and Board staff; observed Defendants' task force; and participated in all-parties' information update meetings. They met with the *Farrell* Special Master, and occasionally consulted with her, to gain a preliminary understanding of the remedies' intersection and impact on each other.

To monitor in the first quarter of 2009, the team observed hearings conducted by six hearing officers and observed on-the-job training for two additional hearing officers. This involved 16 probable cause hearings, three in-custody revocation hearings, three "not in custody" revocation hearings, a revocation extension hearing, and one exit interview. The team did not attempt to observe the service of notice on any parolees. These reviews took place at N.A. Chaderjian, Preston, and Heman G. Stark youth correctional facilities and San Francisco, Los Angeles, Marin, and Santa Rita county jails. In addition to the revocation hearings seen in person, the Mastership analyzed materials for another 20 hearings, most of which included recordings.

During the site visits, the team observed and interviewed six board coordinators and two institutions staff responsible for revocation extensions. The team also visited three parole units, interviewing eight parole agents and supervisors. They met with members of the attorney panel ("CalPAP"), interviewing two leaders, a staff attorney, and seven panel attorneys. The team also observed two "officers of the day" conducting their duties and read the manual for that position.

PDF created with pdfFactory trial version www.pdffactory.com

**Scope and Approach**

This report discusses observations and activities spanning October 2008 through April 2009, collectively referred to as "the Round." References to the Special Master's activities frequently include the actions of a member of his team.

Studies: For many of the requirements, the Special Master's team conducted a study based on revocation packets, hearing documents, and recordings provided in Defendants' monthly document productions, in combination with those same documents produced for the hearings observed during the team's site visits. Since these were not randomly chosen and are a snapshot of a relatively short time, there are limitations on the representativeness of this sample. However, at about 10% of the total hearings since February 2009, this presents one portion of the implementation picture.

CalPAP data captures some practices in the months of the Round preceding the February 2, 2009 implementation. During February, Defendants processed many cases initiated in previous months, applying the new procedures but recording them manually. At the same time, Defendants began processing cases with February hold dates and entering them in the data system. Since nearly all of those did not close until March, the Special Master's examination of data reports generally spans March 1 through April 15, 2009.

For certain questions, the team added, or substituted, revocation packets and hearing documents generated by running a revocation database report and identifying relevant cases by "drilling down" on that report. The length of the period captured varies according to data availability and questions examined. It is worth noting that, as with many new systems, there are various reasons to believe that data from the information

4

PDF created with pdfFactory trial version www.pdffactory.com

system cannot yet be relied upon as fully accurate. Printouts and their analysis, therefore, contribute to the compliance picture but the figures should be considered approximate.

Plaintiffs' objections: in their objections to this report, Plaintiffs frequently asked the Mastership to emphasize that each element of the Stipulated Injunction is a requirement, that it is important to remedy each area not yet in compliance, and that each deficiency harms parolees. The Mastership declines to adopt this stance in this report. It is inarguable that each Stipulated Injunction component is important and that Defendants must demonstrate compliance with each to be granted relief from this Court's oversight; this need not be repeated throughout the document. Defendants also demonstrate an appreciation of these principles.

### Notable Developments

It is extraordinary that, in just over one year, the Defendants have implemented a system with the following features:

- Provides notice of the charges against the parolee and his rights in the proceedings, and has halted the practice of taking waivers and written admissions without counsel

- Ceased use of temporary detentions and rescinded the related regulation

- Conducts supervisory review of probable cause and the charges, and parole staff have gained more responsibility to resolve lower level violations

- Appoints attorneys in all revocation actions proceeding to hearing, and provides them materials necessary to prepare a defense and in time to meet with the client at least two days ahead of hearings, as well as private conditions in which to meet

- Calculates a return to custody assessment, which includes a probable cause assessment, and which serves as an offer of disposition a parolee and attorney can consider and accept without requiring a full revocation hearing

PDF created with pdfFactory trial version www.pdffactory.com

- Holds probable cause hearings and revocation hearings with more legally sound violation reports, more evidentiary protections, structured decisionmaking for penalties up to a maximum of one year, and a written record

- Applies a remedy for revocation hearings held beyond the required date and provides an appeal system and a grievance procedure for ADA concerns

- Converted the terms of revoked parolees in-custody to a date certain

- Initiated a system of hearings for parolees' in-custody misconduct with a similar due process structure

- Practices intended to identify and accommodate those with disabilities or effective communication needs

- Posted and distributed notice of the material terms of the settlement

- Initiated an extensive, complex information system

The Stipulated Injunction required full implementation "no later than 180 days of the signing of this Stipulation, and no later than December 15, 2008."[1] As early as October 2008, Defendants informed Plaintiffs that they would not be able to fully implement by December, and requested an extension of the deadline to February 2, 2009. They stated that the extension would allow them to complete more policy and labor negotiations and to roll out new procedures in a coordinated fashion. After further negotiations with Plaintiffs, Defendants agreed to implement some specific aspects of the Stipulated Injunction by December 15, 2008, notwithstanding their proposed delays. Defendants phased in some practices throughout 2008, and they commenced implementation of all systemic reforms by February 2, 2009, with the exception of training some Parole staff during early February. A great majority of the remedy's

PDF created with pdfFactory trial version www.pdffactory.com

features are now in place, although the execution of some components remains challenging.

## Policies and Regulations

The parties agreed that within 90 days of the parties signing the Stipulated Injunction, and no later than September 15, 2008, the Defendants were to develop sufficiently specific draft policies, procedures, and plans to:

- ensure that revocation proceedings are in continuous compliance with all of the requirements of the Constitution and applicable statutes,

- address a method for accurately tracking the timeliness of hearings and other steps in the parole revocation process,

- include the timely provision of accommodations for juvenile parolees' disabilities and effective communication needs,

- cover not in custody hearings, dual commitments, and parole exit meetings; and

- address such disputed issues as telephonic probable cause hearings, circumstances constituting good cause for delayed hearings, and remedies for untimely hearings.

Policies and procedures were not completed by the deadline, but the parties had worked diligently through that time to formulate and negotiate these documents. During the current Round, work continued along two tracks. Much of what is necessary has been captured and is in practice, but more remains to reach agreement, to generate sufficient detail, and to finalize the documents. The pace slowed as compared with earlier times, but it was adequate. Plaintiffs vehemently contest this assessment, pointing to several delays and the potential for parolees being treated differently if staff do not have a consistent understanding of policies.

PDF created with pdfFactory trial version www.pdffactory.com

On one track, Defendants' divisions considered and moved through approval processes the policies and procedures as formulated in November 2008.[2] Three of them – revocation extension, exit interviews, and attorney standards – reportedly were finalized and distributed in April 2009.[3] The great majority of the policies and procedures are found in a comprehensive revocation process document, one for each of the two divisions principally involved. Those documents remain in negotiation internal to Defendants. In the meantime, Defendants are expecting staff to use most or all of the features of these draft documents and 2008 interim procedures governing reasonable accommodations and effective communication. While official policies are not in place, Defendants have endeavored to put the components in place through memoranda, trainings, conference calls, and other communication methods.

The policies and procedures presently in use were implemented over Plaintiffs' objection to some components. The parties intend to continue to negotiate those aspects, and they reached agreement on a significant number of changes in December 2008. Plaintiffs drafted a stipulation capturing those agreements and it remains to be finalized. A relatively small number of disputes remain, though they concern important aspects of the Stipulated Injunction's terms. Parties' efforts continued through the Round to identify those issues, advance negotiations, and specify resolution processes for the issues seen as being at impasse.

The parties have not collectively determined whether all necessary policies are in process or completed, though Defendants have identified only telephonic probable cause hearings as an outstanding issue requiring a policy.[4]

Notice of terms: Defendants reportedly posted initial and final notices on their

PDF created with pdfFactory trial version www.pdffactory.com

website and in areas accessible to parolees. The Special Master observed that the practice of providing a handout to parolees facing revocation is also beginning.

<u>Regulations</u>: In August 2008, Defendants indicated they had undertaken the mandated review of regulations and had identified nearly 100 requiring change.[5] Since that time, they have indicated in monthly document productions that a list has not yet been prepared. Defendants have not begun to generate new regulations as of yet.[6] The parties have agreed to commence negotiations regarding this issue.

## Stipulated Injunction Requirements

A number of the requirements consist both of substantive due process and of procedural due process, including an element of timeliness. With tracking available through the attorney panel administration and Defendants' newly implemented information system, some measurements are possible.[7] However, as with all new systems, the accuracy and consistency of data entry is limited in this early period, so figures should be viewed as approximate.

**<u>Parole Agent and Supervising Parole Agent conference within two business days</u>** (¶ 27):

Defendants' revocation database shows that 89% of these interactions – or about 123 of 139 cases -- have been timely.[8] The Special Master did not learn anything further about this practice.

**<u>Notice of charges and rights within three business days</u>** (¶ 28):

Early in the Round, Board Coordinating Parole Agents served the parolees; in recent months, this became the responsibility of the agent of record. One agent reported

PDF created with pdfFactory trial version www.pdffactory.com

easy access to parolees in the three counties in which he works; others encountered multiple barriers when attempting to serve in Los Angeles County Jail. The Special Master did not observe any service as it took place.

To satisfy due process, the notice must contain a summary of the conduct underlying the charges sufficient for the parolee to prepare a defense. In the notices the Special Master reviewed, the summary ranged from reasonable to very good in about two-thirds of the cases. The remaining one-third did not describe the conduct.[9] In a similar vein, two parolees filed appeals alleging that incomplete notice of the charges made them unable to defend against their charges.[10] It will be important for Defendants to improve this practice.

In the Special Master's review, the service documents were all present in all but one case, suggesting that the parolees received the charges, with the limitations noted *supra,* and a description of their rights. The third form memorializes efforts to identify disabilities; these were more problematic, but will be discussed *infra*.

It appears that a large majority of notices were served timely. Both a study by CalPAP[11] and the Special Master's analysis of revocation database reports found about an 80% success rate.[12] A different study of individuals indicated a slightly higher compliance rate.[13]

The late service in two of these studies occurred only one to two business days beyond the requirement.

In yet another examination, the Special Master found that fewer genuinely were late, so the success rate may be higher still. The review narrowed the number of late cases to four parolees who were served late or were overdue for service – ranging from 2 days

PDF created with pdfFactory trial version www.pdffactory.com

to 2½ weeks as of the time of analysis – and another three may not have been served.[14] These few failed cases are of a troubling nature. Two things are important to note about this analysis: while it indicates that actual practice could be as high as 93 to 96%, in most circumstances, Defendants would not get credit for this because they *did not demonstrate it.* By not documenting their actions, Defendants create the misimpression of deficiencies. More consistent use of the tracking system will move them toward resolution of this lawsuit much more quickly. .

**<u>Non-acceptance of written admissions to a violation of parole, or waivers of hearing rights or the right to counsel, made prior to the juvenile parolee meeting with counsel</u>** (¶ 17, 31):

Defendants report that they issued staff instruction on these points in April 2008 and there is evidence of this being reinforced toward the end of the first Round. Defendants believe these practices have ended.[15]

On the other hand, the parolee's parole agent serves notice of the violation, investigates, and produces the violation report. This can occur before counsel is appointed,[16] and the reports include parolee statements, if made. The parties disagree as to whether this practice is permissible under the Stipulated Injunction. This is an issue that should be examined further during the coming Rounds.

**<u>Requirements concerning attorney representation</u>**

<u>Provision of counsel during revocation proceedings</u> (¶ 15): Defendants report that attorneys have consistently been appointed for all parolees taken into custody on a new

PDF created with pdfFactory trial version www.pdffactory.com

parole hold since February 2008. There is no system to detect whether any appointments are overlooked. CalPAP administered the attorney panel in 2008. The contract was subsequently put out to bid and awarded to CalPAP.

Timely appointment of counsel (¶ 16):

There is poor timeliness in DJJ providing the information necessary to appoint attorneys. Printouts and a sample both showed only 60% of packets were provided in time for the requirement.[17] .

Both CalPAP and Plaintiffs are concerned that this compresses the time available for administrative duties and for attorney preparation. They note that CalPAP must redact and otherwise prepare the revocation packet, secure an attorney, and schedule an attorney-client interview. Plaintiffs and CalPAP are concerned that the reduced time left to the attorney poses risks to completing the tasks necessary to preparing a defense and to the possibility of an expedited hearing if it is appropriate.

In the cases examined, the delay typically was one to two days, with a handful delayed by three days and one not sent for a month. Attorneys told the Special Master they typically receive documents several days before the probable cause hearing and meet with clients two to three business days ahead. All appeared to know their cases well; several discussed having multiple contacts with their clients and telephoning witnesses, parole agents, and public defenders. When asked, each rejected the idea that the amount of time available to them had made it difficult to prepare in any case to date.

It is the Special Master's opinion that the deficiencies in meeting this requirement, while undoubtedly more difficult for administering the attorney panel, so far have not

PDF created with pdfFactory trial version www.pdffactory.com

negatively impacted the parolees' representation. Timely provision of packets, however, is a requirement, and Defendants should continue to work to improve these low compliance numbers.

At the time of attorney appointment, provision of date, time, and location of the hearing (¶ 16):

CalPAP reports that it is now provided these pieces of information at the same time it receives the packets, a very good advance.

At the time of attorney appointment, provision of a copy of all the evidence on which the State intends to rely or which may be exculpatory; evidence not provided with at least two days' notice shall be excluded unless the state shows good cause (¶ 16, 19):

Interviewed attorneys indicate that they consistently receive all expected documents and do not encounter late-produced evidence. Some DJJ staff indicated that evidence missing from packets was a problem in February; one felt this had been resolved, while another had ongoing concerns.

The Special Master observed one probable cause hearing in which a pivotal piece of evidence had not been provided to counsel. The hearing officer permitted him time to review the evidence and make adjustments, contrary to the requirement to exclude such evidence.

Two hearing officers gave similar, problematic advice in their opening statements at revocation hearings – that they would allow time to review such evidence if the issue

PDF created with pdfFactory trial version www.pdffactory.com

arose. There was no surprise evidence in those hearings. Defendants have agreed to correct this approach, which would be contrary to the Stipulated Injunction if exercised.


At the time of attorney appointment, provision of relevant educational, mental health and disability identification and source documents (¶ 16):

This is one of the most controversial aspects of the implementation to date. Defendants reportedly conducted a comprehensive review of files with the intention of summarizing disability information for lawyers and other users of the files. Defendants first designed a summary form during the previous Round, and revised it to capture substantially more detail in response to concerns from CalPAP and Plaintiffs. While Plaintiffs support such an effort, they objected strongly when the review went forward before negotiations had been completed concerning the necessary components of review and recording, and underlying documents to be provided to attorneys and Board staff.

CalPAP and Plaintiffs assert that many more documents and pieces of information are necessary to inform decisions about reasonable accommodations and effective communication. CalPAP has observed that it is common to receive some source documents in the revocation packets, but the types of documents are highly variable.

The parties have requested that the Mastership conduct a fact-finding hearing on this issue.


Right to be represented by counsel of choice; process for timely notifying of the counsel of record of the imposition of a parole hold (¶ 18):

PDF created with pdfFactory trial version www.pdffactory.com

Defendants assert that they began this process within the time specified in the Stipulated Injunction.[18] The Special Master's review determined that a notification form is in use, but there was evidence of it in only a minority of cases.[19] It appears this is one of the lowest areas of compliance.

Attorney will be informed of Return to Custody Assessment by the 10th business day after the hold (¶ 30):

CalPAP's 10-case sample found 80% of these assessments were provided timely.[20] The late notifications were delayed by one business day.

Counsel to meet with client at least 24 hours prior to the probable cause hearing (¶ 16):

In all probable cause and revocation hearings observed by the Special Master, the hearing officer inquired about the parolee's ability to confer with his or her attorney. Recordings generally reflected this inquiry, as well. In each instance, the parolee and attorney reported contact sufficient to review the charges and documentation. The meeting date was often specified, and was always one day or more before the hearing. Interviewed attorneys indicated it was typical to meet with clients two to three business days ahead of the hearing.

Adequate time for representation; reasonable access to clients and files; confidential phone calls and space in which to meet; observing staff cannot participate in proceedings (¶ 20, 23):

PDF created with pdfFactory trial version www.pdffactory.com

All interviewed attorneys described having adequate time for representation, having received written materials three to five days in advance. Most had not sought out the clients' field files in *LH*, but did not anticipate barriers based on cooperation they have received to date. Attorneys described private locations for meetings and easy access to clients in several locations, though conditions are not yet known at all locations in the state. A few locations posed significant barriers. In particular, more than one attorney described multiple-hour waits as common at Santa Rita County Jail, despite following advance procedures and reasonable cooperation from line staff. One example of nonconfidential phone calls arose, where the client at the DJJ young women's facility sometimes had staff in the room, though the attorney perceived that the client found them beneficial. Those staff did not subsequently participate in proceedings.

### Return to custody assessment within nine business days (¶ 29):

The Special Master observed one hearing officer conducting return to custody assessments. This was done thoroughly, considering the elements of the violations and naming the facts that supported each element before determining whether there was probable cause to proceed. When necessary, he reviewed reference material for the penalty ranges associated with the charges. Plaintiffs, citing examples, are concerned that some hearing officers have not always used the accurate penalty ranges when making return to custody assessments. All hearing officers perform this task in rotation, and it will be important to determine whether these good practices are uniformly in use.

There were a small number of cases; the hearing officer reported that he was completing all the cases that had arrived that day, and that this was common practice.

PDF created with pdfFactory trial version www.pdffactory.com

Defendants' data show that this assessment was timely in 91% of the 85 cases reviewed.[21] The few late cases were completed a short time later, and only one would likely have delayed a timely probable cause hearing or caused the attorney and client to prepare a defense without it.[22]

**Probable cause hearing requirements**

Expedited probable cause hearings (¶ 26): There have been no requests for expedited probable cause hearings.[23]

Probable cause hearings within 13 business days after the hold is placed, including written bases for findings (¶ 32, 40): [24]

***Nature of Hearings***

While many hearing officers oriented parolees to the process and all conducted an ADA review, there were some limitations to their methods; these are described more fully in the discussion of revocation hearings, *infra*. Hearing officers described the probable cause standard, with a few exceptions, and all asked the parolees if they had read and understood the reports containing the accusations against them. All read the charges and the factual basis, and took pleas.[25]

Hearing officers maintained a respectful, open atmosphere in which parolees and attorneys could offer a defense freely. The hearing officers were open to new evidence, sometimes accepting letters or phone calls from parole agents, as well.

For the most part, hearing officers made probable cause findings based on sufficient evidence, and articulated their bases well. The treatment of whether elements were proven was more mixed; one hearing officer found there was no probable cause

PDF created with pdfFactory trial version www.pdffactory.com

based on the failure to show an element, but another did not seem to detect that an important element had not been proven. The bases for findings are not always written in the hearing record.

The disposition portion of the hearing was taken seriously, and commonly consumed about half of the hearing time. For more detail, please see the discussion of revocation hearings, *infra*.

### *Timeliness*

A review of Defendants' database indicates that 86% of 97 recent probable cause hearings were timely.[26] At least some late cases were attributable to delays after extradition and a week's rescheduling after the youth was out to court.[27] There was also one youth whose hearing was initiated timely but was suspended for mental health reasons.[28]

CalPAP's 10-case sample found 56% of the probable cause hearings were timely, but the rest were held only one business day late.[29]

Definition of presumed prejudice (¶ 32):

The parties have negotiated this point but remain in disagreement at this time.

### **Mechanical restraints at hearings** (¶ 46):

The Stipulated Injunction requires Defendants to develop policies, procedures, and training concerning restraints that are consistent with the ADA, the Rehabilitation Act, the due process clause, and Title 15 California Code of Regulations section 4034.4.

PDF created with pdfFactory trial version www.pdffactory.com

The Stipulated Injunction prohibits any policy requiring universal use of restraints in revocation proceedings. There is no agreement on these policies to date.

Defendants currently instruct staff to make a judgment based on violence or risk of escape shown in behavior on parole, institutional behavior, and commitment offense; Plaintiffs strenuously object to reliance on the latter element.[30] Defendants also defer to the policies of non-DJJ institutions – some of which require universal use of restraints, contrary to the terms of the Stipulated Injunction -- when proceedings are held there. Plaintiffs object to these practices, asserting that the decision should be made based solely on recent indicia of violence or escape risk.

The Special Master observed restraints practices at seven sites, and learned staff's experiences in many more locations. They indicated that Los Angeles, Ventura, San Luis Obispo, Santa Barbara, Lake, Fresno, and Santa Rita county jails; Bob Wiley Detention Center; and all CDCR adult institutions require universal restraints. They named only DJJ facilities and San Francisco and Marin county jails as allowing DJJ to exercise discretion.[31] Even in those locations, all parolees were restrained during five of six Special Master visits. One staff member reported he does *not* restrain almost anyone in DJJ facilities; another could not remember an unrestrained parolee there.

Most troubling is the reported policy of universal use of restraints at adult institutions within CDCR. Since the requirement is that "*Defendants* shall not use any blanket policy of requiring mechanical restraints for all juvenile parolees in parole revocation hearings" [emphasis added], and CDCR is a Defendant, it appears that practice must be changed to conform to this court order.

PDF created with pdfFactory trial version www.pdffactory.com

**Requirements related to revocation hearings:**

Final revocation hearing on or before 35 calendar days after the parole hold is placed (¶ 33):

In assessing this requirement, there are a number of considerations. The system must consistently provide timely hearings to the great majority of cases. It must also function to provide hearings timely to special populations, sometimes small groups whose circumstances dictate counting timelines differently or suspending and resuming proceedings once conditions have been met. In operation, the hearings must provide due process, satisfying questions such as fairness, opportunity to be heard, elements of the violation proved sufficient for the applicable standard, and consideration of appropriate sanctions.

*Nature of Hearings*

Defendants have made significant advances in incorporating due process into revocation hearings, though breakdowns occur periodically. Hearing officers take this obligation seriously and they approach the new procedures thoughtfully. Several practices show signs of becoming routine, while others will need to be strengthened before they are effective.[32]

Hearings were conducted in conference rooms and offices suitable to the task in all locations the Special Master visited. In these facilities, there was sound and visual privacy; conditions allowing communication; sufficient room for participants, computers, and files; and reasonable access for witnesses if applicable. Defendants' staff reported similar conditions in other facilities in which they work, about three times as many as the Special Master visited.

PDF created with pdfFactory trial version www.pdffactory.com

Hearing officers set a respectful tone and created conditions conducive to parolees, counsel, staff, and witnesses participating. Although all hearing officers were clearly interested in ensuring the parolees' understanding, some practices were less effective for accomplishing this. Many oriented the parolees well to the purpose and procedures of the hearing, but this did not occur at all in about one-third of the hearings. Sometimes the pace of speech, or closed-ended questions suggesting a "yes" answer was desired, created the risk of missing that a parolee did not understand. One excellent practice was to invite the parolee to describe his understanding of the hearing, and adding details and corrections if necessary.

The conduct of assessments for disabilities and effective communication needs left a similar impression. It is a well-established practice for hearing officers to review a screening form and to ask a series of questions to encourage parolees and attorneys to disclose any parolee needs. Hearing officers use a helpful, conversational style, and some ask in more detail than others, but they generally cover the conditions that might pose an obstacle to effective participation. As with the orientations, speed and closed-ended questions may have created some missed opportunities to identify needs. Plaintiffs observed one such example, where the parolee had a much lower documented reading capacity than his responses to questions indicated, and this was not discovered during the hearing;[33] the Special Master observed this occurring on a few other occasions. As one of several tools, hearing officers ask attorneys if they stipulate that the parolees' ADA needs have been met to date; Plaintiffs strongly object to this practice.

In general, hearing officers' approach to the ADA review would tend to serve those inclined to self-report, but did not appear to independently assess functioning and

PDF created with pdfFactory trial version www.pdffactory.com

understanding. The Special Master observed occasions when a hearing officer identified or adjusted well to a disability that surfaced later in the hearing, or a hearing officer used multiple methods to explain when a parolee appeared confused. These will be good practices for the other hearing officers to develop as well.

All hearing officers reviewed the parolees' rights to some extent. Between them, they covered the landscape of asking whether the parolees had read and understood the reports accusing them, had met with counsel, and whether anyone had made promises about the hearing's outcome, as well as noting the right to a neutral hearing officer, to a copy of the recording, and to appeal the decision. It was rare for a hearing officer to touch on all of these topics.

Hearing officers did not always remember to swear in the parolees and parole agents. They consistently read each charge and took pleas. Laying the foundation for the charges will need to be done more rigorously in the future; it appeared that some key documents, or some of their contents, were used without anyone testifying to them. Substitute parole agents or their supervisors commonly testified in place of the agent of record; it appeared the state routinely subpoenaed police officers and witnesses, an important improvement.

The practice as to objections was mixed. The most common objection was that the hearing was held beyond timeframes. In each such case, the hearing officer gave the time credit remedy if the outcome was a return to custody.[34] This is an important advance, and it is to Defendants' credit that it is well-established this quickly. In a few cases, the attorney argued for dismissal on this basis, and the hearing officer thoughtfully explored whether there was prejudice before concluding there was not and denying the request.

PDF created with pdfFactory trial version www.pdffactory.com

Attorneys also objected to prejudicial information, the veracity of an unsigned document, invalid special conditions of parole, duplicative charges, the use of the matrix, failure to honor the 50-mile rule, and insufficient evidence to prove an element or a charge. While some of these objections were handled thoughtfully, there were also examples evidencing a lack of understanding or a failure to rule on the objection. Additionally, it appears that hearing officers do not always document the objections and their rulings. Each of these aspects should be addressed.

The area of confrontation rights was the most problematic. When objections arose, hearing officers made good faith attempts, but have not mastered the area. The balancing test required by *U.S. v. Comito* was only carried out on one occasion in the cases the Special Master observed. More commonly, hearing officers worked with only some of the factors, blended their reasoning with other concepts such as hearsay exceptions and insufficient evidence, or failed to rule. Hearing officers will benefit from more guidance in this practice. Additionally, the Special Master observed a few instances in which attorneys did not object to hearsay that was central to the state's case; indeed, one hearing officer commented that he had heard many such objections early in implementation but they had since been greatly reduced. Attorneys note, however, that there are sometimes tactical reasons not to raise this objection.

With some frequency, hearing officers' reasoning did work to the benefit of parolees. They entertained seriously motions to dismiss charges for insufficient evidence, and granted several in the cases the Special Master reviewed. Some hearing officers worked with elements of the violations; most could use more instruction in this discipline. It was not always clear what evidence was admitted or excluded, and what

PDF created with pdfFactory trial version www.pdffactory.com

evidence served as the basis for hearing officers' conclusions. Both the findings of sufficiency of evidence, and the bases for findings of good cause on the violations, need to be made more fully and consistently.

Attorneys and clients were allowed to consult privately during the hearings. Parolees were permitted a broad ability to testify and to offer witnesses and documentary evidence. On a few occasions, the state made an error and did not subpoena the parolee's witnesses; the response was handled well in one case, dismissing the charges because of the unfair effect on the parolee who had been in custody substantially longer than 35 days. It was very common for parolees to admit some or all of the charges on their own initiative or in conjunction with a court conviction, so most parolee evidence was offered in the disposition phase.

One due process issue likely to arise is the effect of mental illness on parolees' participation in proceedings. Defendants have written a policy calling for suspending hearings if parolees appear unable to participate for this reason, and facilitating treatment and a return to hearing. Plaintiffs have objected, asserting that all such parolees should be released to community treatment because DJJ facilities are currently unable to meet their treatment needs. This issue remains in negotiation.

In the meantime, the Special Master observed a few promising indications in this regard. During one hearing, a parolee on the mental health caseload refused to attend his hearing.[35] All staff approached this thoughtfully. They held the hearing in abeyance while the attorney attempted contact in the parolee's housing unit. They consulted with his psychologist to gather his opinions about the parolee's stability and whether his refusal might be driven by his illness. They collectively considered the best course of action. All

24

involved were open, flexible, and collaborative in examining the parolee's best interest and how best to gather necessary information. Although it appeared the parolee was *not* decompensated, they made a plan to suspend the hearing for a short period to have his treating clinicians confer and assess him, and the coordinator said the hearing could be put back on calendar in a few days if they determined the parolee was capable of participating.

Additionally, the Special Master's team spoke with another CalPAP attorney about this type of client. While he had not represented someone in this condition, he said he would ask for a suspension and he volunteered that he would make a direct verbal referral to clinical staff; he knew the mechanisms to reach them in DJJ and in county facilities. While there is much more to learn and negotiate, this conversation and the case described above are both encouraging signs about the handling of the severely mentally ill in revocation proceedings.

As to the remaining aspects of revocation hearings, the disposition phase is taken very seriously. In both probable cause and revocation hearings observed, fully half of the time typically was devoted to the disposition. Hearing officers elicited detailed information and considered many arguments supporting release or different types of programming. This phase often took on the tone of a treatment planning session, with all participants collaborating.

Plaintiffs have expressed concern that the maximum return to custody would frequently be employed. This did not occur in the Special Master's review; significant results of 30 cases[36] can be summarized as:

- Continue on parole – 40%
- Drug program in the community – 10%

PDF created with pdfFactory trial version www.pdffactory.com

- Bottom of the range penalty – 20%
- Top of the penalty range – 2 cases
- 12-month penalty – 1 case
- Deviation from the range – only 1 case; it deviated downward

Defendants' staff are required to consider alternatives to incarceration at different steps in the process. Database printouts indicate that 23% to 36% of 99 revocation actions were sent to alternatives by Parole staff.[37] The information system shows hearing officers sometimes recording reasons they did not choose alternatives, so there is clearly some consideration of the issue. Printouts capture no referrals to alternatives by Board staff, but information systems specialists determined that the report was not functioning accurately[38] and Defendants note that it is much more common to record "continue on parole" as the disposition when choosing alternatives. If the cases summarized above are representative, about half of the youths appearing at hearings are not returned to custody. Although the picture is not fully clear, it appears that practice concerning alternatives to incarceration is reasonably good..

Defendants do conclude revocation hearings with a written record. These were handwritten for all cases initiated before February 2009, and in the event that the hearing officer cannot access the information system during the hearing. Unfortunately, interviewed staff reported that the internet has been inaccessible, both by wireless technology and wired alternatives, in at least one-third of the locations in which they worked. With the complexity of a revocation hearing, handwritten records are cumbersome and carry a high risk of an inaccurate or incomplete record, and of not providing copies to counsel or the parolee.

26

PDF created with pdfFactory trial version www.pdffactory.com

Examples of each of these issues was apparent in both handwritten and electronic records. Almost half of the records reviewed were inconsistent with the recording or the Special Master's observation in significant ways. They would omit or add substantial detail regarding evidence or reasoning, or fail to record events such as objections. Although Defendants have described a procedure to enter the contents of handwritten orders into the permanent electronic record, Plaintiffs have encountered instances when this did not occur.

The systems for providing copies to parolees varied; some parolees remained in the room or a nearby holding cell and a copy was provided immediately, while other locations relied on the agent, the attorney, or a circuitous route of FAXes and hand transmissions. CalPAP reported occasional lapses in copies reaching attorneys.

In summary, Defendants have taken important first steps in establishing revocation hearings that provide due process. Many of the necessary components are in place and what remains is for them to be used more consistently. The systems are designed well and are operating moderately well. More training and guidance will be necessary for several key principles.

This level of progress is to be expected. Where staff are not fully versed in all policies, they have easy access to reference materials in hard copy, some online access, and the ability to consult among their small group. Follow-up training has been provided, and more is planned. This is a reasonable start to a complicated process.

PDF created with pdfFactory trial version www.pdffactory.com

### *Timeliness*

To understand whether these hearings were timely, one must be able to assess the time to hearing for:

- mainstream cases[39] completed within 35 days
- mainstream cases pending and still within 35 days
- extradition cases handled according to the *LH* standards calculated from arrival in California, rather than hold date – completed and pending
- activated optional waiver cases, completed and pending
- hearings held while the parolee is not in custody and within 60 days after notice service -- completed and pending
- postponed cases

There have been exceptional gains in the timeliness of revocation hearings. Very few were held within 35 days during the first five months of the Round – a total of 7%.[40] Those hearings were most typically held in two months, with the longest times to hearing at four months.[41] The Special Master cannot practically determine whether there was good cause for any of the late hearings.

Once Defendants fully implemented *LH* procedures, however, timeliness jumped to 44% for the 18 cases heard.[42] Indeed, for cases initiated from February 2009 on, compliance is at 100%. Printouts show two cases late when they were closed and two pending cases as late, but on closer examination, none were late; these involved optional waivers or the hearings were held not in custody and within those timeframes.[43] Likewise, CalPAP found full compliance in a small sample[44] and its monthly tracking showed that February- and March-initiated cases were all heard timely with one exception heard one day late.[45]

At the same time, the number of revocation hearings reduced steadily from 86 in October 2008 to 18 in March 2009.[46] This may suggest that Parole staff are handling

PDF created with pdfFactory trial version www.pdffactory.com

more lower level violations, as the Stipulated Injunction authorized, and that more dispositions are being handled at the probable cause hearing.

Not in custody hearings: There have been eight not in custody hearings since February 2009, and all were held within 60 days.[47] The Special Master observed two of these hearings, and all ADA and due process practices were consistent with those described for mainstream hearings, *supra*.

Extradition: It appears there have been five youth subject to extradition since February 2009.[48] There are no clear patterns, and it appears Defendants have not yet worked out a system for handling them. Notification of return was not always communicated smoothly, both to staff and in the information system. Some notices of rights were served timely, some were not. Probable cause hearings tended to be late, but at least one was timely. None has gone to revocation hearing as of this writing.

Optional waivers: Parolees have begun to take optional waivers. A handful have both taken and activated them; the information system identifies these youth but does not yet capture the timeliness of their hearings. This will be important to address in future information system upgrades.

Parole revocation hearings to be held within a 50-mile radius of the alleged violation (¶ 36):

During training, staff were instructed to check the distance to a hearing site as one step in scheduling.[49] Four revocation hearings were held in violation of the 50-mile limit during the Round, and another 23 occurred outside those limits but with the parolees' agreement.[50] CalPAP attorneys report that parolees make these decisions when there are

29

no witnesses or for strategic reasons; the attorneys do not perceive any pressure or coercion to take this waiver.[51]

There is some indication that DJJ refuses some parolee requests for a 50-mile waiver.[52] Reportedly, this occurs because the State is concerned about legal and practical limits on its ability to compel attendance of its witnesses at a great distance.[53] This has the potential of denying due process to parolees. Since the Mastership has limited facts on this issue, it will be one to examine in the future.

Evidence on the same terms as the state (¶ 33):

The Special Master observed DJJ staff obtaining witness information at the conclusion of each probable cause hearing in which the parolee was continuing to revocation hearing. Parolees commonly presented witnesses, letters, and other evidence at revocation hearings, and no events have come to the Special Master's attention in which a parolee was denied requested witnesses or documents.

Supplemental charges (¶ 34):

To date, it appears that supplemental charges have been used minimally and there is insufficient information from which to draw conclusions.[54]

Definition of good cause for delay, remedy for timeframe violation (¶ 33):

The parties have agreed to define good cause as "justifiable, legitimate and unforeseeable reason for the delay, asserted in good faith and caused by factors that are beyond the control of the State."[55]

PDF created with pdfFactory trial version www.pdffactory.com

They have also agreed that, for any revocation hearing timeframe violation, any return to custody will be reduced by the number of days the hearing is late. The Special Master has observed this remedy being applied in several hearings in 2009. The parties have not undertaken an examination of whether these remedies have been applied in all necessary cases. Only one event came to the Special Master's attention in which it appeared inappropriate that the remedy was not employed; Defendants agreed to address this issue.[56] The parties have agreed that prejudice is presumed, and the case will be dismissed, if, absent good cause, a revocation hearing has not been held by the 90th day after the hold.[57]

<u>Not in custody hearings within 60 days after service and with all due process and ADA protections (¶ 45)</u>

Since February 2, 2009, Defendants have held eight hearings "not in custody," equally distributed between the northern and southern regions. This is about 8% of those violation cases that proceeded to some type of hearing.[58] For all cases where timeliness could be determined, the hearings occurred timely.[59]

**<u>Requirements related to disposition</u>**

<u>Limiting return to custody time to one year except for willful program failure or serious in-custody misconduct (¶ 35):</u>

Defendants assert that they began this process within the time specified in the Stipulated Injunction.[60] While terms given from December 2008 forward appear not to have exceeded one year, Plaintiffs argue that this requirement applied effective with the signing of the Stipulated Injunction and that there are parolees in custody whose terms

31

have exceeded one year and should be released. Resolution of this dispute is a priority for the parties, and they have requested the assistance of the Special Master in a more formal process.

Development of a matrix of ranges of revocation terms for specific violations (¶ 35):

Defendants have put in place the required matrix, which should help reduce the widely varying outcomes that have led to a perception that the system is unfair. During interviews, a number of stakeholders – including parole agents, coordinators, hearing officers, and attorneys – said they believe the matrix penalties are out of proportion to the offenses. Plaintiffs have also objected to the matrix, which they see as carrying more harsh penalties than in the adult system and in the previous juvenile system.

Release within three days if time has been served (¶ 38): Information concerning compliance or noncompliance did not come to the Special Master's attention.

**Requirements related to ADA and effective communication**

ADA and effective communications accommodation (¶ 23, 48, 50, 51, 53):

DJJ put into effect interim policies that define disabilities and effective communication needs, and describe the duties of each type of involved staff to identify and document these needs and to provide reasonable accommodations; Plaintiffs argue that these policies fall far short of what is necessary to meet this obligation.[61] While Plaintiffs correctly note that the Temporary Departmental Order has expired, Defendants

PDF created with pdfFactory trial version www.pdffactory.com

assert that the procedures have been established and continue to be carried out. The parties have sought the Special Master's assistance in resolving the hotly contested disagreements concerning these policies and procedures, and other aspects of meeting ADA requirements.

As described in the first report of the Special Master, Defendants collect a wide range of information going to disabilities and maintain it in a variety of places. All acknowledge that this limits the ability of staff and attorneys to make use of the information, which carries the risk of not timely identifying and accommodating juvenile parolees. Defendants undertook to synthesize some of this information, an effort that represented progress and controversy, as discussed elsewhere in this report.

*LH* procedures require staff to review parolees' files for disability and effective communication information, and to record and transmit it at various steps in the revocation process. Although a form has been institutionalized and was present in all records the Special Master reviewed, more often than not, the form was not completed correctly.[62] In a few cases, the reviewer did not record disabilities readily available in the revocation packet, the principal purpose of the form. This process will need more attention.

Coordinating parole agents said they routinely carry assistive devices to be used in hearings for those with hearing and vision impairments. Policy calls for staff serving notices of rights to also carry these devices; the Special Master has not yet sought information about whether this occurs routinely.

An interpreter from an agency was present for a hearing the Special Master attended, another was apparent in ADA tracking, and staff noted while compiling a

PDF created with pdfFactory trial version www.pdffactory.com

witness list the need to arrange for one upcoming. Staff discussed with ease the system for arranging for outside language and sign language interpreters, though those asked could not recall a need for the latter. Institutions staff are accustomed to drawing on a pool of bilingual staff assistants for other purposes, with one person suggesting in interviews that staff assistants may serve as interpreters for revocation extension actions. It appears staff will need to be reminded that outside interpreters are a requirement for all revocation proceedings.

Identification and tracking (¶ 52): Prior to the first report of the Special Master, Defendants had begun identifying parolees with disabilities or effective communication needs. During this Round, they began a tracking process for probable cause and revocation hearings. Defendants express an intention to also track notice, attorney contacts, and revocation extension proceedings,[63] but this was not available as of late April 2009.

The tracking was designed so that a designated headquarters staff member reviewed all revocation packets at an early stage and entered relevant information for all parolees into a separate database; after hearings, that person also entered information about accommodations provided, if any. This database continued in use for all cases initiated before February 2, 2009; for subsequent cases, Defendants moved the tracking function to their main revocation database.[64]

Few needs were identified in the initial method. About 13% of the parolees with proceedings in 2009 were shown as having accommodation or effective communication needs;[65] this is surprising since Plaintiffs note that Defendants' own documents estimate a

PDF created with pdfFactory trial version www.pdffactory.com

50% need for effective communication assistance, and 80% of youths meeting ADA qualifying criteria, among the DJJ population.[66]

Interpreters were planned as the accommodation for two parolees and two others required glasses; for all others, the attorney was the sole accommodation listed. At the Special Master's request, CalPAP reviewed revocation packets for three of the four parolees who were identified with learning disabilities.[67] The packets contained some documents discussing the parolees' disabilities, but none described the type of accommodation needed, or the type of disability so that an attorney could discern how to accommodate that parolee.[68] Thus, one cannot determine whether the attorney was sufficient accommodation for these young men. Defendants acknowledge that the system needs to capture more detail about the types of accommodations provided.[69]

Defendants indicate that disability and accommodation information on current cases is being entered in the revocation database, but the system does not yet have related reporting capability. They anticipate that reports will be available with the next software upgrade, which is scheduled for release in early May.

Forms in alternative formats (¶ 55):

During the Round, the parties exchanged information about possible accommodations for parolees with vision impairments. Otherwise, progress was not evident on this requirement.

Prohibition of discrimination in parole placements and referrals to services (¶ 27):

Information concerning this requirement did not come to the Special Master's

PDF created with pdfFactory trial version www.pdffactory.com

attention.

Develop an ADA grievance procedure (¶ 54): Interim procedures contain an ADA grievance procedure, including an obligation to inform parolees at specified steps, forms, individuals with specific responsibilities, and deadlines. The procedure provides for a review before the hearing in which the accommodation has been requested, an appeal if accommodations were not provided, and a new hearing within 15 days if such an appeal is granted. Defendants report receiving no ADA grievances in 2009.[70]

**Development of an appeal process** (¶ 43): Defendants assert that they began this process within the time specified in the Stipulated Injunction.[71] There was evidence of appeals in use in February and March 2009.[72] In all but one of the appeals reviewed by the Special Master were answered within 10 business days after receipt, as required.[73] Each appeal response contained a detailed description of the sources reviewed, the claims, and the reviewer's reasoning.

Defendants provided all appeals for the months of February and March 2009. These principally concerned the length of revocation terms; one appeal was granted, while the others were denied because the penalties were consistent with the ranges in the revocation matrix.[74] Some appeals raised the *LH* timeframes, but were denied on the basis that the hearings preceded Defendants' planned implementation date; Plaintiffs disagree with this basis for denial for any proceedings commenced on or after December 1, 2008.

PDF created with pdfFactory trial version www.pdffactory.com

An appeal based on the state's failure to subpoena the parolee's witness, and holding the hearing outside the 50-mile limit, was granted. Four appeals also discussed time calculation and were denied or referred to the responsible agency, and two felt the hearing officer was biased. One appeal alleged the possibility of a mental disorder underlying the violation behavior. Two parolees alleged incomplete notice of the charges leading to an inability to prepare a defense; one of these was incorrectly handled as a claim of insufficient *time* to prepare. Only one of all of the appeals above was granted.

Defendants are also conducting a system of decision review, which serves some useful functions but is problematic in operation. Defendants indicate that they have a policy governing this practice, though its terms remain disputed between the parties. Reportedly, headquarters staff and the hearing officer serving as "officer of the day" review every written hearing record for adequacy of documentation, consistency with revocation process policy, and for any mistake of fact or law. Where a decision is thought to have substantial flaws in one of these areas, a decisionmaker reviews the case and, if he agrees, reverses the decision and orders a rehearing. Defendants anticipate making this process available when requested, as well.[75]

To date, these decisions have not been tracked and the rationale has not been recorded or provided to parolee counsel or other staff involved. The revocation database records for known cases do not clearly reflect that this process has even occurred, and not all original hearing records were preserved.[76]

Defendants believe that reversal has been employed in four probable cause hearing decisions. In each, the original hearing result was to continue on parole or dismiss the case. One case was reheard within four days, others within two weeks. The

PDF created with pdfFactory trial version www.pdffactory.com

results were the same in one case, a rejected offer of return to custody now proceeding to revocation hearing, and a return to custody for 12 months.[77]

Such a process must be conducted with more transparency, and must include providing counsel and other interested persons the rationale for reversing a final result. It is an open question whether the criteria being applied are consistent with policy standards; Plaintiffs and CalPAP contend that it is not. If scheduling a rehearing carries a risk of extending the parolee's time in custody, Defendants should make every effort to rehear that case in the shortest time possible.

**Comprehensive annual training on ADA and effective communication, the Stipulated Injunction's requirements, policies and procedures, due process** (¶ 56):

Defendants assert that they have conducted extensive training on various requirements through 2008 and 2009, some of which the Special Master observed and found to be beneficial. . Plaintiffs have objected to the adequacy of these trainings, particularly concerning disabilities and effective communication needs. They call for renewed training in light of policies that have changed during the year and staff confusion they have observed; they emphasize the need for training on the topics the Special Master has found deficient in this report.

**Tracking mechanism for timeframes and reasons for delay** (¶ 13, 32, 33):

One of the strongest features of Defendants' implementation to date was designing and launching a detailed, complex information system that serves well in facilitating many aspects of compliance and tracking performance. This system was

PDF created with pdfFactory trial version www.pdffactory.com

implemented in February 2009 and is a much more advanced effort than is common at this stage of many institutional conditions lawsuits.

Reportedly, staff encountered the usual difficulties with access and unexpected functioning during the initial roll-out. In addition to troubleshooting, the information system professionals have designed an upgrade they anticipate installing in early May 2009. Reports and other documents continue to reflect operations staff's lack of familiarity with some aspects of the database, which likely makes some of the current data unreliable. Plaintiffs are particularly disturbed by this, citing one case where a significant amount of information disappeared. Staff and the Special Master have been identifying logic errors and needed functions and reports, which can be remedied as a normal part of this process.

As described *supra*, one of the greatest difficulties has been erratic access to the system. Consistent use of an electronic information system will be critical for reliability of information and of the revocation systems themselves, as well as for demonstrating compliance.


**<u>Monitoring process</u>**

In December 2008, the parties reached agreement concerning a detailed monthly production of documents and recordings by which Plaintiffs may review some aspects of the remedy's implementation. Defendants have produced those materials monthly in 2009.

In February 2009, the Plaintiffs filed a motion asking the Court to resolve the question of whether Plaintiffs are entitled to monitor. The parties withdrew the motion in

PDF created with pdfFactory trial version www.pdffactory.com

March 2009 after agreeing to a regular schedule of onsite monitoring by Plaintiffs for 2009.

The Stipulated Injunction requires Defendants to develop a self-monitoring team to ensure compliance with its terms and with relevant policies and procedures (¶ 57). The Special Master understands that this is under development.

**Revocation may be extended only after a revocation extension hearing, and parolee must receive copy of decision** (¶ 35, 40):

DJJ indicates that, during or prior to this Round, it ceased using "time-adds" and parole consideration hearings for youth in DJJ on a parole revocation. These mechanisms previously had extended time in custody.[78] No parties have conducted a review to determine that these practices have, in fact, been fully discontinued. No reports of problematic cases have been presented to the Special Master.

DJJ has instituted the revocation extension system,[79] with required steps and associated timeframes. It appears that nine incidents have gone into the revocation extension process.[80] The process steps appear to have been completed timely, although it is not clear that all data have been entered. Of the five cases where outcome could be discerned, the penalties ranged from two to six months.[81]

One important feature of this process is the requirement to expedite the revocation extension process if it occurs close in time to a parolee's date for release from the facility. It appears that a few incidents have occurred shortly before planned release. Not all information was available, but it appears that staff followed policy in at least two cases and completed proceedings within 35 days after the parolee would have been released; in

PDF created with pdfFactory trial version www.pdffactory.com

one of those, proceedings were completed very quickly, within 17 days after discovery of the conduct.[82]

The Special Master does not have sufficient information to determine whether parolees are receiving copies of their written hearing records; the team is aware of one parolee who did receive a copy and one who did not.[83]

**Policies and procedures governing dual commitments** (¶ 45):

DJJ has drafted policy that, when approved, will include the handling of dual commitments.[84] This policy requires further internal drafting and negotiation with Plaintiffs' counsel. During the Round, CDCR also issued instructions to facilitate the transfer to hearings for DJJ parolees housed in CDCR adult institutions.[85]

**Elimination of "temporary detentions"; immediate rescission of relevant regulation** (¶ 39):

Defendants instructed field staff to end temporary detentions effective in April 2008.[86] The parties have not yet undertaken a review of whether the practice has completely ceased. No reports of temporary detentions have come to the Special Master's attention.

The Stipulated Injunction requires Defendants to "immediately rescind Title 15, California Code of Regulations § 4985," which concerns this practice. Defendants report that this regulation and Title 15, California Code of Regulations § 4826 were repealed on December 18, 2008.[87]

PDF created with pdfFactory trial version www.pdffactory.com

**Summary**

Defendants have put in place many systems necessary to implementing this remedy, and significant improvements are already evident. A number of rights are clearly more protected. Parole staff are developing and presenting better evidence, and probable cause hearings generally operate well. There is a strong showing of timeliness on most process steps in cases initiated after the implementation date, and the number of cases preceding that date are diminishing. The well-designed information system will be a valuable tool is managing the cases and demonstrating compliance.

Certainly, deficiencies and incomplete or inconsistent practices are apparent, just as they are in any new system. Some are merely individual errors or small-scale breakdowns. Those requiring the most attention, at this point, are practices identifying and accommodating disabilities and effective communication needs -- predictably a large group in this population – and the more nuanced aspects of substantive due process in revocation hearings. The areas of greatest controversy between the parties concern a parolee subpopulation living in DJJ longer than one year, and the documents and information necessary to convey disability and effective communication needs. Continued and sustained negotiation is still needed to formulate some remaining features of the remedy.

The Special Master commends the parties on their work to date and makes no recommendations at this time.

Chase Riveland  /s/ *Chase Riveland*                    May 24, 2009
Special Master

PDF created with pdfFactory trial version www.pdffactory.com

[1] The Stipulated Injunction was signed by the parties on June 3 and 4, 2008.

[2] Source for much of this section is informal communications with Defendants

[3] Letter from S. Renteria to G. Grunfeld, Apr. 23, 2009

[4] *Id.*

[5] Informal communications with Defendants

[6] *LH* Compliance Report, Mar. 23, 2009

[7] As a reminder, most measurements will be of the period from Mar. 1, 2009 through Apr. 15, 2009

[8] Closed Case Summary, Mar. 1 through Apr. 15, 2009; Open Case Summary for each of Mar. 17, Mar. 31, Apr. 4, 12, 16, and 20, 2009. Where Open Case Summaries are used, the analysis averages them to reach the number typically open at any given time.

[9] 14 individuals' records among the monthly productions and hearings observed

[10] 2 appeals provided in Feb. and Mar. 2009 monthly productions

[11] Document with the computer file name CalPAP sampling of cases 4-23-09.doc. This is an accidental sampling of 10 cases; because of size and method, it may not be representative, but is a useful piece of the analysis and confirms findings of other studies.

[12] Closed Case Summary, Mar. 1 through Apr. 15, 2009; Open Case Summary for each of Mar. 17, Mar. 31, Apr. 4, 12, 16, and 20, 2009. The studies showed 85 of 106 cases timely, and 8 of 10 cases timely, respectively.

[13] Revocation packets or database records for 18 individuals in hearing observations, monthly productions, or other revocation database research. Among these, 15 (83%) were served timely. Another two cases were returned from out of state; one was served timely and one was served five business days late.

[14] Notice of Rights by Unit, Feb. 2 through Mar. 31, 2009, shows 13 cases missed, but an examination of those cases yields different results. In addition to the four late cases, three cases have proceeded to another step; this may indicate either that no service took place or that it was not recorded in JSTS. Two cases are not late: one is in custody out of state and is not yet available for service, and for one, service was attempted timely while he was out to court and it has since been determined that he is non-707b and will be handled by county courts instead of DJJ. Field files showed that the final three cases were served timely but the service was not recorded in JSTS. Additional sources: Case Status Reports for eight parolees; Special Master's onsite review of five field files (copies not retained). *Accord* Closed Case Summary – Case Prep Events, Feb. 2 through Mar. 31, 2009.

[15] See, *e.g.,* memorandum with the subject line LH v Schwarzenegger CalPAP Protocol, ADA Accommodation, Waivers & Admissions, Apr. 14, 2008; memorandum with the subject line LH v Schwarzenegger DJPO Will Cease Accepting Waivers or Written Admissions Prior to Appointment of an Attorney, Apr. 30, 2008; memorandum with the subject line BCPA Instructions, Sept. 15, 2008 (in Jan. monthly production)

[16] The investigation occurs before CalPAP attorneys are appointed. Parolees have counsel of record related to prior criminal proceedings; some continue representation in parole revocation proceedings and some do not.

[17] DJJ Cases Closed/Cases With a Detainer Date After Apr. 30, 2008 run for Mar. 2009, analysis of cases with holds from Feb. 2, 2009 forward; document with the computer file name CalPAP sampling of cases 4-23-09.doc

[18] *LH* Compliance Report, Mar. 23, 2009

[19] It was present in 8 packets among those reviewed in the monthly productions or in conjunction with observed hearings or database research questions. There were additional mentions of specific cases in the cover sheets to the Feb. and Mar. 2009 monthly productions.

[20] Document with the computer file name CalPAP sampling of cases 4-23-09.doc

PDF created with pdfFactory trial version www.pdffactory.com

[21] Closed Case Summary, Mar. 1 through Apr. 15, 2009; Open Case Summary for each of Mar. 17, Mar. 31, Apr. 4, 12, 16 and 20, 2009

[22] Closed Case Detail by JPB – Step RTCA, Feb. 2 through Mar. 31, 2009

[23] CalPAP Requested Expedited Hearings, Feb. 2 through Mar. 31, 2009

[25] Sources for this section are the Special Master's observations and individual records in the subfolder Individual Hearings Seen Onsite

[26] Closed Case Summary Mar. 1 through Apr. 15, 2009; average of Open Case Summary for each of Mar. 17, Mar. 31, Apr. 4, 12, 16, and 20, 2009

[27] Open Case Summary, Mar. 31, 2009; individuals' records in Open Case Lateness Analysis subfolder, with computer file names beginning Open Case-Late at PCH

[28] *Id.*

[29] Document with the computer file name CalPAP sampling of cases 4-23-09.doc

[30] Informal communications with Defendants

[31] These discussions did not cover every location in California, however.

[32] Sources for this section are the Special Master's observations, individuals' documents associated with site visits, and hearing recordings and documents in the monthly productions

[33] Letter from S. Huey to M. Brady, Apr. 10, 2009

[34] The Special Master observed only one exception, which is subsequently being addressed. See discussion *infra*.

[35] In this case, it was a probable cause hearing.

[36] These include dispositions at probable cause hearings as well as at revocation hearings

[37] Closed Case Alternatives to Incarceration Summary, Feb. 2 through Mar. 31, 2009

[38] Informal communications with Defendants

[39] This term is used to describe those revocation actions that follow the normal course. The concept excludes cases with special circumstances, such as not in custody hearings, extradition, parolee time waivers, optional waivers, and postponements.

[40] Revocation Hearings held more than 35 days from Detainer Date, Dec. 15, 2008 through Jan. 9, 2009 and Jan. 10 through Feb. 1, 2009; DJJ Cases Closed/Cases With a Detainer Date After Apr. 30, 2008, run for each of October 2008 through February 2009. This analysis excludes 8 cases that were heard Not in Custody; they will be discussed in that section.

[41] *Id.* through Jan. 2009

[42] DJJ Cases Closed/Cases With a Detainer Date After Apr. 30, 2008 run for Mar. 2009

[43] Closed Case Summary, Mar. 1 through Apr. 15, 2009; Closed Case Detail, Mar. 1 through Apr. 15, 2009; Step RevH Open Case Detail Step RevH run Apr. 24, 2009; individual cases in folders RevH Lateness Analysis and Individual Hearings Seen Onsite (for NIC cases)

[44] Document with the computer file name CalPAP sampling of cases 4-23-09.doc; the 10-case sample reviewed four cases that went to revocation hearing

[45] DJJ Cases Closed/Cases With a Detainer Date After Apr. 30, 2008 run for Mar. 2009

[46] Revocation Hearings held more than 35 days from Detainer Date, Dec. 15, 2008 through Jan. 9, 2009 and Jan. 10 through Feb. 1; DJJ Cases Closed/Cases With a Detainer Date After Apr. 30, 2008, run for each of February and March 2009

[47] Document with the computer file name DJJ Proceedings Schedules.pdf; Revocation Hearings held more than 35 days from Detainer Date, Dec. 15, 2008 through Jan. 9, 2009 and Jan. 10 through Feb. 1, 2009; individual cases in Individual Hearings Seen Onsite. There were another 3 NIC hearings held in January, according to the schedules, but timeliness could not practically be determined.

[48] Closed Case Summary – Extradition, Feb. 2 through Mar. 31, 2009; individual cases in Extradition subfolder

[49] Observed at Juvenile Parole Board training Jan. 5, 2009

[50] CalPAP DJJ Statistics 50 Mile Report for each of Oct. 2008 through Mar. 2009

[51] Informal communications with CalPAP

[52] See, *e.g.,* Parole Board Order for Dixon, 89110, for the hearing dated Mar. 11, 2009 (in Mar. document production). CalPAP indicates that this has happened more than once, but it does not have practical means to identify the cases or estimate the number.

[53] Informal communications with CalPAP

PDF created with pdfFactory trial version www.pdffactory.com

[54] Closed Case Detail – Supplemental Charge Cases, Feb. 2 through Mar. 31, 2009; Case Status Reports for four individuals recorded as having supplemental charges; Open Case Summary -- Supplemental Charge Cases Apr. 19, 2009. On examination of some of the individual records, it appears that some of these are *not* supplemental charge cases and some are incomplete records.

[55] Joint Stipulation Regarding Modifications to Division of Juvenile Justice Parole Revocation Policies and Procedures draft provided Mar. 25, 2009; informal communications with parties

[56] Board Order and hearing recording for individual in the Feb. document production; informal communication with defendants

[57] Joint Stipulation Regarding Modifications to Division of Juvenile Justice Parole Revocation Policies and Procedures draft provided Mar. 25, 2009; informal communications with parties

[58] Youthful Offender Parole Board Hearing Calendar for each week from Feb. 2 through Apr. 17, 2009 (except one week in March); Closed Case Summary for the same period. Because there are a number of internal inconsistencies in the revocation database, it is not possible to determine reliably what percentage this is. It was not feasible for the Special Master to determine practice prior to this date.

[59] Closed Case Summary – NIC Referral Cases, Feb. 2 through Apr. 17, 2009. This report captures five of the cases, suggesting that there may be data entry issues with other cases.

[60] *LH* Compliance Report, Mar. 23, 2009

[61] Memorandum with subject line Interim Accommodation/Effective Communication Policies and Procedures, Sept. 2, 2008 (in Jan. document production)

[62] Individual parolee records in the subfolders titled Individual Hearings Provided in Monthly Productions and Individual Hearings Seen Onsite

[63] ADA/Effective Communication Tracking Report for each of December 2008 through March 2009; letter from S. Renteria to M. Lang dated Mar. 12, 2009

[64] Informal communications with Defendants; the change to using a different tracking system likely accounts for the greatly reduced number of cases captured in the March 2009 report generated by the earlier system.

[65] ADA/Effective Communication Tracking Report for each of January through March 2009. The total number of entries was 152, with 19 parolees identified as needing accommodation or measures for effective communication. Of these, 2 needed assistance with English, 5 had impaired vision, 9 had mental health needs, and 8 had learning disabilities or otherwise required assistance in understanding (some parolees had more than one of these issues).

[66] Informal communications with Plaintiffs, who cited CDCR Budget Concept Statement Fiscal Year 2008/09, Division of Juvenile Justice/Juvenile Parole Board, as well as several studies and articles showing similar rates of learning disabilities, mental illness, and other disabilities in incarcerated youth elsewhere

[67] Three individual parolees' packets filed in ADA documents (subfolder of Materials Relied Upon-OSM2)

[68] Informal communications with CalPAP

[69] Informal communications with Defendants

[70] Emails covering monthly productions for each of December 2008 through March 2009

[71] *LH* Compliance Report, Mar. 23, 2009

[72] See appeals submitted with the Feb. and Mar. 2009 document productions

[73] See 23 appeals submitted with the Feb. and Mar. 2009 document productions. The one that was untimely was a third submission on the same appeal; since there is only one level available, timelines may not apply to this appeal.

[74] In one case, the time exceeded the matrix range but the reviewer found that the hearing officer had documented sufficient reason to vary from the range.

[75] Informal communications with Defendants

[76] Individual records in subfolder Decision Review; the Special Master is not aware of the identity of the fourth individual

[77] *Id.*

[78] *LH* Compliance Report, Mar. 23, 2009; email with the subject Parole Violators, Oct. 30, 2008 (in Jan. monthly production)

[79] *LH* Compliance Report, Mar. 23, 2009; Special Master's observations

[80] Revocation Extension Open Case Summary by Facility, Mar. 31, 2009; Revocation Extension Closed Case Summary by Facility, Feb. 2 through Mar. 31, 2009 (this report did not vary when reviewed with the starting date of Dec. 15, 2008); Revocation Extension Hearing Results, Dec. 15, 2008 through Mar. 31,

PDF created with pdfFactory trial version www.pdffactory.com

2009; Revocation Extension Level 3 Behaviors, Dec. 15, 2008 through Mar. 31, 2009; weekly email summaries from CalPAP, Jan. 9 through Apr. 3, 2009

[81] Revocation Extension Open Case Summary by Facility, Mar. 31, 2009; Revocation Extension Hearing Results, Dec. 15, 2008 through Mar. 31, 2009; DJJ Rev Extension Cases Closed run for each of Jan. through Mar. 2009

[82] JSTS reports in Rev Ext subfolder; informal communications with Defendants concerning individuals' release dates

[83] Informal communications with CalPAP

[84] Division of Juvenile Justice Parole Violation Process (draft provided in Jan. document production)

[85] Memorandum with the subject line Release of California Department of Corrections and Rehabilitation Inmates on Dual Commitments to Division of Juvenile Justice Custody for Transportation to and From Juvenile Parole Revocation Hearings, Dec. 31, 2008

[86] Memorandum with the subject line LH v. Schwarzenegger Implementation of Probable Cause Hearings and Cessation of 30-Day Temporary Detention Holds, Apr. 14, 2008 (in Jan. document production)

[87] *LH* Compliance Report, Mar. 23, 2009

PDF created with pdfFactory trial version www.pdffactory.com