## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

L.H, et al.,

      **Plaintiffs,**

vs.                                          `NO.CIV.S-06-2042 LKK/GGH`

ARNOLD SCHWARZENEGGER, et al.,

      **Defendants.**

_____/

### THIRD REPORT OF THE SPECIAL MASTER
### ON THE STATUS OF
### CONDITIONS OF THE STIPULATED ORDER

#### Background

The Plaintiffs in this case filed their Complaint with the Court on September 13, 2006. The Court certified this case as a class action by Order dated February 28, 2007.

On September 19, 2007, the Court granted partial summary judgment in favor of Plaintiffs, holding that California's juvenile parole revocation system, by failing to provide a timely probable cause hearing, violated the due process rights of the Plaintiff class as those rights were described in *Morrissey v. Brewer.* On January 29, 2008, the Court held that Defendants' failure to appoint counsel for all juvenile parolees violated the due process rights of the Plaintiff class, according to precedent set in *Gagnon v. Scarpelli.* In the same order, the Court also found that Defendants' policies and practices violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The

1

PDF created with pdfFactory trial version www.pdffactory.com

Court ordered the Defendants to:

(1)  begin appointing counsel to represent juvenile parolees at parole revocation hearings no later than February 15, 2008, and to provide that counsel with access to confidential contact space and the necessary files sufficiently in advance of the hearing to allow adequate preparation,

(2)  allow parolees to obtain counsel of their own choosing, who shall be able to represent clients under the same terms as appointed counsel, and Defendants are to notify the parolee's counsel of record or public defender when a hold is placed,

(3)  ensure effective communication and provide necessary accommodations, and

(4)  develop sufficiently specific policies and procedures to ensure continuous compliance with all of the requirements of the American with Disabilities Act during revocation proceedings.

Chase Riveland and Virginia Morrison were appointed as Special Master and Deputy Special Master, respectively, on May 22, 2008. The parties, on June 13, 2008, submitted a Stipulated Motion for Preliminary Approval of Class Settlement. The Court granted the motion on June 17, 2008 and approved a Stipulation and Order for Permanent Injunctive Relief on October 7, 2008 (hereafter "Stipulated Injunction").

On April 2, 2009, the parties filed a Stipulation and Order Re: Plaintiffs' Motion to Monitor Defendants' Compliance with the Stipulated Order for Permanent Injunctive Relief.

The Court entered a "Stipulation and Order Requiring Defendants to take Immediate Steps to Identify and Track Juvenile Parolees with Disabilities and Effective

PDF created with pdfFactory trial version www.pdffactory.com

Communication Needs, dated July 7, 2009. The parties also negotiated a stipulation modifying several aspects of policies and procedures, which this Court signed on September 10, 2009.

## Special Master Activities

The Special Master assisted the parties in resolving certain ADA and effective communication issues. The team observed the Defendants' task force and participated in all-parties' information update meetings. The team observed proceedings at Heman G. Stark Youth Correctional Facility and Los Angeles and Santa Rita county jails. Those proceedings were conducted by three hearing officers and consisted of seven probable cause hearings, three revocation hearings, an optional waiver review, one revocation extension hearing, and one exit interview. The team did not attempt to observe the service of notice on any parolees. In addition to the revocation hearings seen in person, the Mastership analyzed recorded and written materials for another 28 revocation hearings and two revocation extension hearings, demonstrating the work of seven hearing officers.

## Scope and Approach

This report discusses observations and activities spanning May 2009 through September 2009, collectively referred to as "the Round." References to the Special Master's activities frequently include the actions of a member of his team.

A number of mandates consist both of procedural due process requirements and due process in how they are conducted; all aspects are included in the Special Master's assessment. The term "mainstream cases" refers to those revocation actions that follow

3

PDF created with pdfFactory trial version www.pdffactory.com

the normal course; it excludes cases with special circumstances, such as not in custody hearings, extradition, parolee time waivers, optional waivers, and postponements.

For many of the requirements, the Special Master's team conducted a study based on revocation packets, hearing documents, and recordings provided in Defendants' monthly document productions, in combination with those same documents produced for the hearings observed during the team's site visits. Since these were not randomly chosen, there are limitations on the representativeness of this sample. In other instances, the team relied on reports generated by Defendants' revocation database, Plaintiffs' monitoring reports and analyses, reports or studies conducted by the CalPAP attorney panel administration, and sometimes documents underlying these sources.

## Policies and Regulations

The parties agreed that within 90 days of the parties signing the Stipulated Injunction, and no later than September 15, 2008, the Defendants were to develop sufficiently specific draft policies, procedures, and plans to:

- ensure that revocation proceedings are in continuous compliance with all of the requirements of the Constitution and applicable statutes,

- address a method for accurately tracking the timeliness of hearings and other steps in the parole revocation process,

- include the timely provision of accommodations for juvenile parolees' disabilities and effective communication needs,

- provide for not in custody hearings, dual commitments, and parole exit meetings; and

- address such disputed issues as telephonic probable cause hearings, circumstances constituting good cause for delayed hearings, and remedies for untimely hearings.

PDF created with pdfFactory trial version www.pdffactory.com

The parties have reached agreement on a substantial number of policies, and continue negotiation on others. Policies and procedures have been signed and distributed concerning the overall revocation process, attorney standards, revocation extension, and exit interviews. A revised policy concerning disabilities and effective communication is pending dissemination. The parties memorialized further agreements in the stipulation and order referenced *supra*.

Plaintiffs strongly emphasize that the distributed policies contain provisions to which they object, and they see complete policies, consistently trained and applied, as a critical foundation for implementation and thus overdue. The parties have not collectively determined whether all necessary policies are in process or completed.

Notice of terms: During 2008, Defendants reported detailed methods used to provide posters and notices to DJJ, CDCR, and county jail facilities. Plaintiffs noted that posters were absent in two of Defendants' facilities they visited[1] and Defendants reported they redistributed posters in English and Spanish in October 2009.[2] Neither the parties nor the Special Master have undertaken a review of whether posters are in all required locations within these facilities. Since Defendants reported that DJJ facilities requested 90 posters after the initial distribution, it is likely that many are available to parolees, but a review would be useful.[3]

Regulations: Defendants have begun the lengthy, complex revision and approval process on many regulations affected by the *LH* remedy, with multiple staff tasked with this responsibility. Plaintiffs have provided comment to enhance those revisions, and they note a regulation set for which revisions have not yet been produced.

PDF created with pdfFactory trial version www.pdffactory.com

## Stipulated Injunction Requirements

The Defendants coordinate a variety of divisions and external entities in working toward fulfilling the requirements of the Stipulated Injunction. The greatest accomplishments are in establishing procedures and systems well-designed to manage the work flow in service of protecting parolees' rights. Likewise, Defendants have implemented mechanisms for self-correction that are critical to reaching and maintaining compliance. Several of these systems are operating well, and more is needed to satisfy the Court's orders.

The budget crisis carries particular risk for cases like *LH*, where compliance is heavily dependent on deadlines. Work weeks shortened by furloughs, layoffs resulting in staff turnover and heightened training needs, and hiring limited to finite terms all combine to create substantial pressure on staff dedicated to meeting timeframe requirements. In a small department such as the Juvenile Parole Board, the loss of half of the clerical staff, for example, is keenly felt. While timeliness numbers do not yet appear to be impacted, Defendants will likely need to be increasingly creative to fulfill their obligations, and the Court will need to closely monitor the budget's effects.

**Parole Agent and Supervising Parole Agent conference within two business days** (¶ 27):

Defendants' revocation database shows that this function is operating well; 94% of these interactions have been timely for the mainstream population, an improvement over the prior Round. Most of the late cases were completed the following day, and the longest time to completion was nine days.[4]

PDF created with pdfFactory trial version www.pdffactory.com

All extradition cases were also timely at this step.[5] For parolees referred for not in custody hearings by a parole unit, however, conferences for 71% were timely,[6] though late cases generally completed within an additional one to two business days.

It appears that the parole agent-supervisor conference resolved about 13% of the 468 non-extradition holds.

**Notice of charges and rights within three business days** (¶ 28):

In the Special Master's revocation packet review, the service documents were present in all but two cases, suggesting that the parolees received the charges and notice of their rights. The third form memorializes efforts to identify disabilities; these were more problematic, but will be discussed *infra*.

To satisfy due process, the notice must contain a summary of the conduct underlying the charges sufficient for the parolee to prepare a defense. In the notices the Special Master reviewed, about 62% of summaries ranged from reasonable to very good. Another 10 cases yielded mixed results – some charges were reasonably detailed while other charges were inadequately described. The remaining seven did not describe the conduct.[7] Neither the Special Master nor Plaintiffs have observed service as it took place and therefore do not have a sense of the due process during that communication.

As to timeliness, about 87% of notices of nearly all populations were completed within the required time.[8] Nearly all late cases were served within four days after the deadline.[9] Not in custody cases were served within 10 business days, with one exception, consistent with Defendants' policy. One extradition case may not have been served.

PDF created with pdfFactory trial version www.pdffactory.com

In 12 cases, Defendants encountered barriers in their initial attempts to serve parolees.[10] All but one of the initial attempts were timely, and four cases were ultimately served timely on a later attempt. The remainder were completed one to two days past the deadline. The reasons they were untimely were all reasonable, with the exception of lack of access to two parolees housed in administrative segregation. These numbers reflect a conscientious effort to serve parolees quickly despite the obstacles encountered.

**Non-acceptance of written admissions to a violation of parole, or waivers of hearing rights or the right to counsel, made prior to the juvenile parolee meeting with counsel** (¶ 17, 31):

Revocation packets indicate that Defendants have ceased the routine practice of asking parolees to make written admissions during the investigation. Plaintiffs continue to object to the parolee's parole agent taking oral statements at the service of notice of rights and charges and during the investigation, before counsel is appointed;[11] the parties disagree as to whether this practice is permissible under the Stipulated Injunction.

**Requirements concerning attorney representation**

Provision of counsel during revocation proceedings (¶ 15):

All indications are that attorneys have consistently been appointed for all parolees taken into custody on a new parole hold since February 2008. It would be useful for Defendants to devise a  system to detect whether any appointments are overlooked.

Timely appointment of counsel (¶ 16):

In the initial months of the Round, timeliness in DJJ providing the information

PDF created with pdfFactory trial version www.pdffactory.com

necessary to appoint attorneys remained poor. It improved significantly, in absolute numbers and percentages, in each month from July forward. The overarching compliance rate for the Round was 73% for the mainstream population, though compliance is unknown for not in custody and extradition cases.[12] There is insufficient information at this time to determine the effect this may have had on attorney preparation or rescheduling of hearings.

       <u>At the time of attorney appointment, provision of date, time, and location of the hearing</u> (¶ 16):

       Defendants are compliant with this provision, as CalPAP reports that it is provided these pieces of information at the same time it receives the packets.

       <u>At the time of attorney appointment, provision of a copy of all the evidence on which the State intends to rely or which may be exculpatory; evidence not provided with at least two days' notice shall be excluded unless the state shows good cause</u> (¶ 16, 19):

       The Special Master did not observe any instances of late-produced evidence to which counsel objected. In one hearing recording, the hearing officer reviewed the parole agent's supervision notes, which were not included in the revocation packet. During the previous Round, attorneys said that this function was operating well, and it appears that that generally continues.

       <u>At the time of attorney appointment, provision of relevant educational, mental health and disability identification and source documents</u> (¶ 16):

PDF created with pdfFactory trial version www.pdffactory.com

The parties took significant steps on this highly controversial issue during the Round. They agreed on a method for Defendants to conduct a large-scale review of files and electronic databases to incorporate disability information for lawyers and others into a summary form. Defendants reported that they began compiling some information into the summary in July, trained reviewers in its use in September, and have agreed to complete a comprehensive review by November 30, 2009. These summaries will serve to provide educational, mental health and disability information to attorneys ongoing. A dispute remains about what is sufficient to satisfy the requirement to provide source documents.

<u>Right to be represented by counsel of choice; process for timely notifying of the counsel of record of the imposition of a parole hold</u> (¶ 18):

In contrast to the prior Round, the Special Master's review determined that a notification form was much more routinely used to notify public defenders and private attorneys of a parole revocation proceeding for their clients. Timeliness was poor overall, but improved steadily during the Round. Only 59% were clearly provided in the time mandated by policy. Another 15% were sent by the required time to notify CalPAP; while this exceeds the parties' agreement and could create logistical problems for CalPAP, it also arguably could fit the Stipulated Injunction's requirement to timely notify counsel. In the remaining cases, timeliness could not be discerned because the form was undated, no forms were present, or the notification was late up to 15 days after the hold.[13] No revocation extension cases contained this notification as Defendants maintain this is not required, a position that Plaintiffs contest.

PDF created with pdfFactory trial version www.pdffactory.com

Documents indicate that only two attorneys outside of CalPAP indicated their intention to represent youth in the DJJ proceedings, and only one went forward with representation.[14]

Attorney will be informed of Return to Custody Assessment by the 10th business day after the hold (¶ 30):

Defendants' revocation database shows good compliance with this requirement, with these assessments provided by the 10th business day in 95% of the largest proportion of the population.[15]

Counsel to meet with client at least 24 hours prior to the probable cause hearing (¶ 16):

This system appears to be operating very well. In interviews and observations during prior Rounds, the Special Master determined that attorneys commonly meet with their clients one to three days ahead of hearings. No new information came to the Special Master's attention during this Round.

Adequate time for representation; reasonable access to clients and files; confidential phone calls and space in which to meet; observing staff cannot participate in proceedings (¶ 20, 23):

In previous Rounds, all interviewed attorneys described having adequate time and access to information. They indicate there were private locations for meetings and easy access to clients in several locations, with a notable exception at Santa Rita County Jail. No new information came to the attention of the Special Master during this Round.

PDF created with pdfFactory trial version www.pdffactory.com

Because there is only one DJJ facility for women, attorney representation issues there bear monitoring. Issues, isolated to date, have been reported when the alleged violation conduct took place in Northern California and the parolee wishes to proceed with a revocation hearing. In these cases, a second attorney may assume responsibility for the revocation hearing, and there are complexities involved in coordination of the first and second attorneys, and in the remote attorney reaching the parolee by phone and in a confidential setting.

Additionally, Plaintiffs note that, when coordinating parole agents both serve as a sounding board for hearing officers and provide security during attorney-client consults in the hearing room, it potentially implicates the prohibition on observing staff participating in proceedings.

### Return to custody assessment within nine business days (¶ 29):

The Special Master was unable to observe hearing officer practice in assessing at this stage probable cause and the need for continued detention. Timeliness was good, with Defendants' data showing this assessment completed timely in 91% of the largest proportion of the population, consistent with the prior Round. The great majority were completed one to two days later, and the longest time to completion was 21 business days.[16] It appears that eight cases were resolved at this step.

### Probable cause hearing requirements

Expedited probable cause hearings (¶ 26): There have been no requests for expedited probable cause hearings.[17]

PDF created with pdfFactory trial version www.pdffactory.com

Probable cause hearings within 13 business days after the hold is placed, including written bases for findings (¶ 32, 40):

### Nature of Hearings

Many hearings are initiated with an interactive ADA review, a review of the parolees' rights, and an orientation to the process. Written guides have assisted with these functions; there are still some hearing officers whose hearings would improve if they were to ensure that each of these occurred consistently. Plaintiffs would like to see the guides improved.

ADA reviews are the least successful. While hearing officers usually touch on most or all of the topics, nearly all do so rapidly and in a manner that inadvertently suggests the correct answer is that the parolee does not need help. Given how many incentives youthful parolees have to hide or disavow disabilities and other needs, for any ADA review to be effective, a reviewer must invite conversation, watch for cues, and ask follow-up questions to detect the likelihood that a parolee may not understand without help. Training, particularly with practice, would be extraordinarily helpful.

Hearing officers clearly care about the parolees, and set a respectful tone conducive to participation, although Plaintiffs and the Special Master have observed hearings that were troubling exceptions. Parolees may present evidence in their defense, including contesting probable cause. In cases where there is a problem with probable cause, it has to do with the absence of one or more elements of the violations charged. To their credit, some hearing officers dismissed or amended charges when some elements were not proved, both at the return to custody assessment and at probable cause hearing.[18] More universal knowledge, among hearing officers and parole staff, is needed. By design,

PDF created with pdfFactory trial version www.pdffactory.com

some violation reports contain duplicative charges, for example, absconding and failure to report to the parole agent during the same period of time. Depending on the evidence available, the system relies on hearing officers to dismiss either the lesser included charge or the greater charge. The severely mentally ill present a particularly difficult challenge as all concerned seek to balance their treatment and due process needs. Where parolees appear unable to participate in revocation proceedings because of mental illness, the parties agreed to work collaboratively. Few such cases have been apparent, to date. As to the one known parolee during this Round, his probable cause hearing was suspended for a few weeks and concluded in July; Plaintiffs object that the agreement to notify and work with them was not followed in that instance.

Hearing officers do consistently assess whether there is probable cause for the violations, subject to the limitations described above concerning the elements. Hearing practice will be stronger when there is a separate assessment of whether there is probable cause to detain the parolees pending hearing. This does occur on some occasions, as evidenced by a data report showing cases that went to probable cause hearing, where a not in custody revocation hearing was then ordered.[19] Dispositions continue to be addressed thoughtfully. Parolees are provided a written record through a variety of methods, depending on location. It has not yet been assessed whether these methods are effective.

### *Timeliness*

The Parole Board handled at least 317 probable cause hearings during the Round.[20] Among them, 88% were timely,[21] a slight improvement over the prior Round.

PDF created with pdfFactory trial version www.pdffactory.com

Most of the late cases were completed within four days after the deadline, and the longest time to hearing was an additional 16 days.

Postponing hearings is a contentious issue that carries the risk of compromising due process. The parties have agreed to a definition of good cause for delay that involves unforeseeability and being beyond the State's control.[22] The parties have not agreed on a set of situations that would consistently fit these criteria, nor have they agreed concerning delays caused by county jails and other non-State, involved actors. Defendants' and CalPAP's records show postponements during this term at parolees' requests; where the facility could not accommodate the hearing; and because of parole agent illness or the parolee was not transported, in the case of revocation hearings.

Whether good cause exists or not, a postponed hearing must be rescheduled in a reasonable time, or within the requested time for parolee waivers. The information system does not currently permit a systematic review of postponements, but there are indications of problematic rescheduling. Among the cases reviewed,[23] nearly all of the probable cause hearings took five to 13 days to reschedule; one revocation hearing took three weeks. While the reasons are unknown at this time, and contributing factors may come from attorneys, jails, and external factors as well as Defendants, it remains Defendants' burden to demonstrate reasonable practice. Defendants would do well to put in place systems to expedite rescheduling, or to reinforce them if they already exist.

Definition of presumed prejudice (¶ 32):   Defendants assert that the parties negotiated one definition to be used for both types of hearings, while Plaintiffs indicate that a definition applying to probable cause hearings remains to be developed.

15

**<u>Mechanical restraints at hearings</u>** (¶ 46):

The Stipulated Injunction requires Defendants to develop policies, procedures, and training concerning restraints that are consistent with the ADA, the Rehabilitation Act, the due process clause, and Title 15 California Code of Regulations section 4034.4. The Stipulated Injunction prohibits any policy requiring universal use of restraints in revocation proceedings.

During the Round, the parties reached agreement on several aspects of restraints use, including the standard for assessing whether to use them in DJJ facilities, and conditions for applying them. Plaintiffs strenuously object to Defendants deferring to the policies of county jails and CDCR adult institutions, some of which require universal use of restraints, contrary to the terms of the Stipulated Injunction. Additionally, Los Angeles County Jail's routine practice of restraining prisoners to furniture and the floor is objectionable and is counter to the parties' stipulation and order entered in September 2009.

The Special Master observed restraints practices onsite and in hearing records. Prior visits and interviews identified eight county jails and all CDCR adult institutions as requiring universal restraints, and another such jail surfaced during this Round. Within DJJ facilities, there were a few problematic practices. In one case, staff "deferred to institution policy" in DJJ, where all acknowledge staff are to exercise discretion. Similarly, Plaintiffs objected to one facility's policy to automatically restrain any prisoner who ordinarily lives in an adult institution. There was one observed instance of staff

16

PDF created with pdfFactory trial version www.pdffactory.com

restraining based on the parolee's commitment offense after policy eliminated that as a permissible criterion.

**Requirements related to revocation hearings:**

Final revocation hearing on or before 35 calendar days after the parole hold is placed (¶ 33):

In assessing this requirement, there are a number of considerations. The system must consistently provide timely hearings in the usual course of revocation proceedings. It must also function to provide hearings timely to special populations, sometimes small groups whose circumstances dictate counting timelines differently or suspending and resuming proceedings once conditions have been met. In operation, the hearings must provide due process, satisfying questions such as fairness, opportunity to be heard, elements of the violation proved sufficient for the applicable standard, and consideration of appropriate sanctions.

### *Nature of Hearings*

Many of the practices observed in probable cause hearings also take place in revocation hearings. They begin with an assessment of the parolee's accommodation needs, effective communication needs, and ability to understand and participate; a review of the parolee's rights; and an orientation to the hearing. The strengths and weaknesses discussed in the context of probable cause hearings are evident here, as well.

PDF created with pdfFactory trial version www.pdffactory.com

Hearing officers generally took pleas and swore in witnesses. In addition to concerns about violation elements described *supra*, other evidentiary concerns arise in revocation hearings.

There can be a tendency to rely on the file, as is done in probable cause hearings, rather than ensuring that evidence is put on the record through testimony. On at least one occasion, this came at the cost of denying the parolee's right to witnesses. Similarly, sometimes information will be factored into decisions that is not part of the hearing record, such as prior experiences with the parolee.

Preserving the right to confrontation, and keeping it in balance with the State's interests, is a difficult task that hearing officers have not yet mastered. The State has provided several useful trainings, including at least two during this Round. More knowledge of the factors is evident, but more practice, in training and *in situ*, will be necessary for this to be done correctly. It is a critical skill to achieve due process in revocation hearings, as hearsay is often the only, or most powerful, potential evidence against a parolee, and is pivotal in whether liberty is lost.

Policies related to one component of the confrontation issue are developing well. The parties agreed to a procedure to balance the parolee's right to confront adverse witnesses with the needs of fearful witnesses. The hearing officer must determine, based on objective factors, that face-to-face confrontation would result in significant emotional distress to the witness. The attorney may object to designating the witness as fearful; if the objection is overruled, there is a procedure for the parolee to be removed during testimony, with the opportunity to hear the testimony and to consult with his or her

18

PDF created with pdfFactory trial version www.pdffactory.com

attorney concerning the examination before the witness is excused. The Special Master has not yet observed this procedure in operation.

As in probable cause hearings, hearing officers approach disposition very thoroughly and thoughtfully. Though the problem has been observed on rare occasions, hearing officers would do better were they to take care not to take into account arrests where there was no conviction, and charges dismissed in prior proceedings or on appeal.

On the other hand, a growing appreciation for evidentiary issues, and facility with them, is apparent in the increasing number of charges dismissed when the State does not meet its burden of proof. Hearing officers dismissed 23 cases, including 17 for due process reasons such as insufficient evidence and lack of jurisdiction.[24]   Additionally, about 14% in the Special Master's study sample was dismissed.

In the sample, alternatives to incarceration were given in almost one-third of the revocation hearings. There was, however, no discussion of this issue during the hearings for the majority of cases reviewed. Hearing officers did generally document why alternatives were not chosen, though they sometimes recorded inaccurate information. For example, in a few hearings, the parolee is described in the written record as having refused programs, when no discussion of alternatives had taken place on record. These and similar choices can lead to distrust of whether hearing officers are considering that option.

As to the use of alternatives to incarceration more generally, Defendants' data indicates that about 40% of holds were resolved with alternatives pre-hearing, and about 19% of the remaining parolees were sent to alternatives during their probable cause or revocation hearings.[25]

PDF created with pdfFactory trial version www.pdffactory.com

There are a variety of systems to provide written records to the parolees. The concerns about accuracy, when electronic entry is delayed, are described elsewhere in this report. About two-thirds of the records in the Special Master's review were fully consistent with the audio recording, with the others omitting or adding detail, usually concerning reasoning. In monitoring reports, Plaintiffs noted another five cases where significant detail was omitted or changed in the electronic record.

### *Timeliness*

There were approximately 101 revocation hearings during the Round. To understand whether these hearings were timely, one must be able to assess:

- mainstream cases[26] completed within 35 days   (52% of all revocation hearings)
- cases pending and still within 35 days (5%)
- extradition cases completed according to the *LH* standards calculated from arrival in California, rather than hold date (1%)
- activated optional waiver cases, completed within 35 days after receipt of activation request  (26%)
- hearings held while the parolee is not in custody and within 60 days after notice service (16%)
- postponed cases reheard within the requested time or a reasonable time

Timeliness was strong in the 53 completed mainstream cases. Only four were late, and these were completed within four days, with one exception. [27]  The longest time to hearing was two weeks late.

On average, there were five open cases at any given time, with timeliness equally well observed.[28]

Not in custody hearings: There were 16 not in custody hearings in the Round and these, too, were held within 60 days, were pending within the required time, or were rendered moot by a second arrest on other charges.[29] The two exceptions were delayed by

PDF created with pdfFactory trial version www.pdffactory.com

five days or more. For further discussion, see *infra*.

Extradition: The single extradited parolee who sought a revocation hearing received it within timeframes.[30]

Optional waivers: During the Round, 59 parolees took optional waivers; of those, 26 activated their waivers and have concluded revocation proceedings.[31] Optional waiver activations sent by CalPAP were received timely; information was not available concerning those sent by parolees. All but one of the proceedings following optional waiver activation concluded within 35 days of activation, the timeframe Defendants have set for themselves. Plaintiffs object, asserting that the timeframe should be 35 days less the time expended up to the point the optional waiver was taken.

Postponed: Neither tracking system is able to demonstrate the time to hearing for postponed cases at this time.

In conclusion, therefore, the vast majority of revocation hearings were held timely.

Parole revocation hearings to be held within a 50-mile radius of the alleged violation (¶ 36): Despite the challenge of a small staff responsible for wide geographic areas, Defendants are complying with this requirement well. One revocation hearing was held in violation of the 50-mile limit during the Round, and another occurred outside those limits but with the parolees' agreement.[32]

Evidence on the same terms as the state (¶ 33):

This system is operating well. The Special Master observed DJJ staff obtaining witness information at the conclusion of each probable cause hearing in which the

PDF created with pdfFactory trial version www.pdffactory.com

parolee was continuing to revocation hearing. Parolees commonly presented witnesses, letters, and other evidence at revocation hearings. On one occasion in the Special Master's observations, a parolee was denied disposition witnesses.

Supplemental charges (¶ 34):

During this Round, it appears there were seven cases with supplemental charges.[33] The parties agreed that supplemental charges may not be made based on evidence contained in the field file at the time the violation report is completed; no party reviewed those seven cases for consistency with this agreement.

Definition of good cause for delay, remedy for timeframe violation (¶ 33):

The parties have agreed to define good cause as "justifiable, legitimate and unforeseeable reason for the delay, asserted in good faith and caused by factors that are beyond the control of the State." They have also agreed that, for any revocation or revocation extension hearing timeframe violation, and for any probable cause hearing held after 35 days, any return to custody will be reduced by the number of days the hearing is late. Plaintiffs, however, reserved their objection to any amount of lateness, and continue to maintain that any late case without good cause is a violation of the Stipulated Injunction.

Prejudice is presumed, and the case will be dismissed, if, absent good cause, a revocation hearing has not been held by the 90th day after the hold.[34]

Not in custody hearings within 60 days after service and with all due process and ADA protections (¶ 45)

There were 16 not in custody hearings in the Round. This is about 5% of those

PDF created with pdfFactory trial version www.pdffactory.com

violation cases that proceeded to some type of hearing, significantly fewer than the prior Round.[35] In the hearings the Special Master listened to, due process and ADA protections were comparable to those in Defendants' revocation hearings.

These proceedings may be initiated at the parole unit, without taking the parolee into custody, or, at an in-custody probable cause hearing, the hearing officer may order the parolee released pending such a hearing. All but two of these hearings were timely, were pending within the required time, or were rendered moot by a second arrest on other charges.[36] Hearing records indicate that one parolee did not receive notice of the hearing date; the hearing officer dismissed the case.

### Requirements related to disposition

Limiting return to custody time to one year except for willful program failure or serious in-custody misconduct (¶ 35):

There is good compliance with this requirement. The parties resolved their dispute during the Round concerning the length of time to be served by parolees in custody as of the signing of the Stipulated Injunction. Defendants report that all parole violators now have a date certain for release, and that all taken into custody prior to that system have been released.[37] All terms the Special Master has observed in 2009 have been within the maximum term. Defendants have begun use of a revocation extension system to consider cases of serious in-custody misconduct; it is discussed *infra*.

Development of a matrix of ranges of revocation terms for specific violations (¶ 35):

PDF created with pdfFactory trial version www.pdffactory.com

Hearing officers routinely use the required matrix. Policy permits a two-month deviation from the penalty ranges, up to a one-year total term. The department struggled with interpreting the deviation provisions, and confusion was evident. Decisionmaking could be erratic as a result. In fact, the sufficiency of justification for deviation was a principal reason for the handful of cases that reversed a decision and ordered a rehearing through the "decision review" process.

Plaintiffs observed, on occasion, hearing officer language referring to the length of a desired training, and Plaintiffs object, saying this evokes the previous policy, now impermissible, of tying the length of sentences to specific treatment and training objectives.

Various stakeholders – including parole agents, coordinators, hearing officers, and attorneys – continue to assert that the matrix penalties are out of proportion to the offenses. Plaintiffs have also objected to the matrix, which they see as carrying more harsh penalties than in the adult system and in the previous juvenile system. During the Round, the parties negotiated changes to some charge codes, and the parties intend to meet and confer concerning the matrix.


Release within three days if time has been  served (¶ 38): Information concerning compliance or noncompliance did not come to the Special Master's attention.


**Requirements related to ADA and effective communication**

ADA and effective communications accommodation (¶ 23, 48, 50, 51, 53):

The parties devoted substantial effort to negotiating revisions to policies and

PDF created with pdfFactory trial version www.pdffactory.com

procedures for identifying and addressing disabilities and effective communication needs, and they made great strides during the Round. A revised policy reportedly is nearing distribution. They reached agreement, memorialized in a stipulation and order, on a method for summarizing key disability, effective communication, and necessary accommodation information, discussed *supra*.

    <u>Identification and tracking</u> (¶ 52):

    <u>Identification</u>:   *LH* procedures require staff to review parolees' files and databases for disability and effective communication information, and to record and transmit it at various steps in the revocation process. Although the procedures have been institutionalized, they are not yet working well.

    With some frequency, reviewers do not record disabilities readily available in the revocation packet, the principal purpose of the form.[38]  There appears to be a pattern of omitting parolees' reading level, a significant indicator for whether there may be effective communication needs; Plaintiffs also cite some instances in which it was inaccurately recorded.[39] Plaintiffs also question instances where learning disabilities or special education needs are identified and staff indicated no accommodations were necessary. Occasionally, new issues surface during hearings but are not recorded on the form for future use. On the other hand, Defendants improved their revocation database to allow the capture of more detailed ADA-related information.[40]

    <u>Tracking</u>: Defendants began operating a different disability tracking method during the Round but, as Plaintiffs note, the reports serve limited purposes. Although they are meant to indicate when Defendants planned and provided accommodations, there is

PDF created with pdfFactory trial version www.pdffactory.com

little specific information about the types of needs or accommodations, whether they were provided at each necessary step, and which individuals were accommodated. Defendants' data system indicates that there were no instances when a parolee requested an accommodation and it was denied.[41] The lack of clarity and specificity must be addressed to have a functioning identification and tracking system. Partly as a result, the Special Master is unable to comment in this report concerning accommodations.

The need for identification and tracking is particularly high in a juvenile system. While actual numbers have not been established, a variety of sources suggest the need is far higher than that identified in the tracking system to date..[42] The combination of missed information in forms, incomplete assessment during hearings, and reports insufficiently detailed to provide oversight creates great risk for whether these important needs can be met.


Forms in alternative formats (¶ 55): No new information came to the attention of the Special Master.


Prohibition of discrimination in parole placements and referrals to services (¶ 27): Information concerning this requirement did not come to the Special Master's attention.


Develop an ADA grievance procedure (¶ 54): Interim procedures contain an ADA grievance procedure, described in the second report of the Special Master. Defendants report receiving no ADA grievances in 2009.[43]

PDF created with pdfFactory trial version www.pdffactory.com

**Development of an appeal process**  (¶ 43):

Defendants' appeal process handled 20 appeals concerning revocation or revocation extension during the Round,[44] 80% of which appear to have been answered within 10 business days after receipt, as required. Commonly, responses were completed in an additional day, and the longest time to response was four business days late.[45] Plaintiffs assert that some appeals are stamped as received substantially after the date of signature, suggesting a further delay in some response times. CalPAP tracking shows that it received notice of all decisions within the required five business days; it is unknown whether decisions also reached parolees in this time.

Each appeal response contained a detailed description of the sources reviewed, the claims, and the reviewer's reasoning. Appeals most commonly concerned a finding of good cause, the length of revocation terms, or the desire for another disposition. Others charged that a Board order inaccurately reflected proceedings, the decision review process was handled unfairly, hearing officer bias, failure to take into account the impact of mental health, that time credit related to extradition and a late hearing were incorrectly calculated, and that a finding was based on hearsay improperly admitted under *Comito* or on insufficient evidence. The latter three appeals were particularly well handled. One-third of the appeals were granted in whole or in part, including the evidentiary questions.

Defendants document five requests for tapes in recent months. These requests reportedly were filled in one week or less, with one exception taking 24 days.[46]

Defendants are also conducting a system of decision review. Reportedly, headquarters staff and the hearing officer serving as "officer of the day" review every written hearing record for adequacy of documentation, consistency with revocation

27

PDF created with pdfFactory trial version www.pdffactory.com

process policy, and for any mistake of fact or law. Where a decision is thought to have substantial flaws in one of these areas, a decisionmaker reviews the case and, if (s)he agrees, reverses the decision and orders a rehearing.

Defendants do not track these decisions. While CalPAP has begun tracking, there have been instances when it was not notified,[47] or learned with insufficient time to prepare for the rescheduled hearing. This latter practice was described in an appeal, which alleged that the original Board order did not accurately capture the hearing findings and outcome but was not provided until the attorney was notified that the case had been reversed and the rehearing was the following day. The reversal included a direction to amend the charge, which was honored at the rehearing but amended *again* and without notice back to the original charge, before the revocation hearing. In decision review cases in general, the rationale and the course of proceedings is not always evident from hearing records. All of the aforementioned facts raise substantial questions about due process.

It appears that reversal has been employed in three probable cause hearing decisions during the Round.[48] In each, the original hearing result was to continue on parole, dismiss the case, or mitigate below the matrix's range of penalties. Cases were reheard after six days, three weeks, and three and one-half weeks. The results were the same in two cases and another ended with a return to custody for 12 months.

The following comments from the Second Report of the Special Master bear repeating: Such a process must be conducted with more transparency, and must include providing counsel and other interested persons the rationale for reversing a final result. It is an open question whether the criteria being applied are consistent with policy

PDF created with pdfFactory trial version www.pdffactory.com

standards; Plaintiffs and CalPAP contend that it is not. If scheduling a rehearing carries a risk of extending the parolee's time in custody, Defendants should make every effort to rehear that case in the shortest time possible.

**Comprehensive annual training on ADA and effective communication, the Stipulated Injunction's requirements, policies and procedures, due process** (¶ 56):

Defendants assert that they have conducted extensive training on various requirements through 2008 and 2009, some of which the Special Master observed and found to be beneficial. Plaintiffs have objected to the adequacy of these trainings, particularly concerning disabilities and effective communication needs.

The Board receives short, frequent trainings in conjunction with its regular meetings. Paroles staff participated in refresher training in September 2009. Plaintiffs attend trainings and provide feedback on content and on practice problems evident in trainees' discussion. Plaintiffs object that they receive materials with little or no time for comment ahead of trainings, and sometimes receive little notice of the trainings.

Further training for all divisions is anticipated in the coming months.

**Tracking mechanism for timeframes and reasons for delay** (¶ 13, 32, 33):

Defendants employ a complex information system that facilitates many aspects of compliance and tracking performance. During the Round, they continuously refined its operations, releasing several upgrades. Perhaps most importantly, they added the ability to scan revocation packets into the system, making critical information simultaneously available to the divisions and parolee attorneys. This removes several obstacles to timely

PDF created with pdfFactory trial version www.pdffactory.com

procedures and hearings, quickly overcoming problems that some other systems have struggled with for years.

The system is well-designed to capture nearly all needed data points. Some reports need refinement to make better use of that available information and to troubleshoot a few inaccurately operating functions. There are staff dedicated to these improvements and the Mastership is confident that they can be accomplished.

Field staff are evidently learning; predictably, this sometimes results in overwriting records or other actions that can make records difficult to follow or appear inaccurate. Nevertheless, improvements over the prior Round are clear and the system is producing better information on which to make management decisions and compliance assessments. As mentioned in previous reports, erratic access to the system, particularly in non-DJJ facilities, undermines the reliability of information and of the revocation systems themselves, and the ability to demonstrate compliance. Seven locations were discussed during the Round where internet access was periodically or permanently unavailable; these may be in addition to facilities noted in prior reports of the Special Master. These included DJJ facilities, a CDCR adult institution, and county jails. In most instances discussed, staff had a nearby alternative, but some had to wait to transcribe information until much later in the day after the hearings concluded. The risk of inaccurate information seems to have been realized in two known cases in which the parolee's attorney or Plaintiffs' counsel allege that the hearing record contains an outcome different from the Board's verbal order.[49]

**Monitoring process**

PDF created with pdfFactory trial version www.pdffactory.com

In previous Rounds, the parties reached agreement concerning a detailed monthly production of documents and recordings by which Plaintiffs may review some aspects of the remedy's implementation. Defendants have provided those materials monthly. Plaintiffs have raised concerns about the completeness of productions and the accuracy and utility of some documents.[50] The parties are considering revisions to the production.

The parties have also agreed to a number of onsite visits by Plaintiffs' counsel in 2009. Plaintiffs have conducted six independent monitoring tours and accompanied the Mastership on three tours to date. For the most part, Plaintiffs reported good access to the facilities and staff, though there was one exception. Plaintiffs are seeking to negotiate modifications for future monitoring, particularly to view the conduct of requirements they have not yet been able to observe. The parties remain in disagreement concerning whether Plaintiffs are entitled to conduct post-settlement monitoring.

The Stipulated Injunction requires Defendants to develop a self-monitoring team to ensure compliance with its terms and with relevant policies and procedures (¶ 57). Defendants have made good strides in this regard. They initiated this process by forming a workgroup comprised of staff from CDCR's Office of Audits and Compliance and subject matter experts from each affected program. The workgroup designed an audit tool, including methods for measurement, for attorney standards and representation. Office of Audits and Compliance staff and CalPAP reportedly have begun to apply the tool, including observing hearings.

As the next step, the workgroup has designed three division-specific audit tools for reviewing accommodations and effective communication. The Defendants plan to have the audit team perform a 30-day follow-up to assure that corrective action has occurred.

PDF created with pdfFactory trial version www.pdffactory.com

For an extended period, Defendants have convened regular, multidisciplinary meetings to design and troubleshoot the processes. Recently, the group added a very helpful oversight mechanism. Each division identifies cases that were late at a step the division is responsible for; the division investigates each, puts in place a remedy, and reports each of these components to the group monthly. These are excellent problem-solving and accountability measures.

Important functions are in place for internal oversight, a critical foundation for reaching compliance and for demonstrating the state's ability to resume responsibility for full oversight of its system. Some of the next steps should include revising information system reporting capabilities to capture key information that is currently not accessible, and to improve accuracy in a few respects. Similarly, staff will need to continue to work on their skills and consistency in use of the system to increase its reliability.

**<u>Revocation may be extended only after a revocation extension hearing, and parolee must receive copy of decision</u>** (¶ 35, 40):

DJJ is operating a revocation extension system, which handled 16 cases during the Round.[51] There is indication that the frequency is increasing, however.[52]

There are timelines associated with each process step, and compliance ranges from moderate to poor. Where cases were late, they tended to miss the mark by weeks. In specific:

- Notice was timely 63% of the time. Late notices ranged from two to 33 days late.[53]
- Documents were provided to Juvenile Parole Board staff within timeframes in only 47% of the cases.[54]
- Documents were provided to CalPAP timely 75% of the time.[55] While DJJ reduced some of the time created by late notices, late appointments took an extra 11 to 25 days.

PDF created with pdfFactory trial version www.pdffactory.com

- The Revocation Extension Assessment was completed timely in 80% of cases.[56]
- Probable Cause Hearings were held timely in 75% of the cases. Late cases were held one to three weeks late.[57]
- Revocation hearings fared better. Among the three held, two were timely and one was three weeks late.[58]

The Special Master does not have information concerning whether parolees are receiving copies of their written hearing records.

**Policies and procedures governing dual commitments**  (¶ 45): While Defendants have a policy governing dual commitments,  information suggested periodic problems when juvenile parole officers attempted to coordinate with adult parole officers. Plaintiffs also note that, if revocation actions proceed under both systems, there is a risk of duplicate sentences and of evidence or a finding in one system's hearing being used in the second system's hearing.

**Elimination of "temporary detentions"; immediate rescission of relevant regulation** (¶ 39):

The Stipulated Injunction requires Defendants to "immediately rescind Title 15, California Code of Regulations § 4985," which concerns this practice. Defendants report that this regulation and Title 15, California Code of Regulations § 4826 were repealed in prior Rounds.

**Summary**

Defendants continue to make good progress in building a solid revocation system. Systems are beginning to function more consistently, there is sustained effort to examine

PDF created with pdfFactory trial version www.pdffactory.com

and address deficient practices, and the parties are reaching more agreements on policy. Most compliance numbers tend to be moderate but improving, a reasonable posture at this stage of implementation. Budget cuts, including furloughs, carry the risk of impact on Defendants' practices; it will be important to continue to monitor the State's ongoing budget crisis and its effect on Defendants' ability to comply with the Court's orders and the parties' negotiated policies and procedures.

In broad strokes, the system is functioning as follows. Parolees commonly receive notice of their rights and charges timely; the majority of written notices provide information sufficient to prepare a defense, but a significant minority does not. Electronic and paper documentation, and practices during hearings, do not clearly establish that disabilities and effective communication needs are being identified consistently, and there is a risk that such parolees are not being accommodated.

Attorneys outside the CalPAP system are routinely notified of parole holds; this practice can be late, but almost no such attorneys have opted to undertake representation. The system for CalPAP representation operates smoothly. Although DJJ sometimes provides initial information late to CalPAP, it appears attorneys have been appointed to all youth facing revocation during the Round, and attorneys report having sufficient time, information and conditions to represent clients well.

Probable cause hearings are conducted largely on time by hearing officers who take the task seriously and work hard to seek the balance between public safety and what is good for the parolee. Parole agents have improved the quality of information on which to make a probable cause assessment. To better preserve due process, all concerned need a greater understanding of the elements of violations. Nevertheless, a significant number of

34

PDF created with pdfFactory trial version www.pdffactory.com

charges are dismissed or amended for this reason, prior to or during this proceeding. Also, a significant number of violation behaviors are addressed by the parole units without proceeding to hearing, and other hearings are conducted in the community without taking the parolee's liberty.

The number of revocation hearings continues to decrease, as resolution is achieved at earlier steps. Most are held timely, including those for special populations such as extraditions and parolees who activate optional waivers. Some of the greatest difficulties occur in revocation hearings, as hearing officers struggle with new practices of taking evidence, assessing the competence of potential evidence, and matching evidence to the elements that the state is required to prove. Great care is taken with dispositions. The internal practice of "decision review" leads to some rehearings; some of its execution has been problematic and raises due process concerns.  Decision review has the potential to be a helpful function in addressing some of the lack of evidentiary knowledge, but greater transparency is needed.  Parolees and their attorneys are making use of the appeals system, and some cases have been overturned or modified in parolees' favor.

There are, of course, many more nuanced requirements in this litigation, as discussed *supra*, but in general, this is a picture of a reasonably functioning system, given the early stage of implementation, that is greatly improved by the parties' efforts over the past 16 months.  The Special Master makes no recommendations at this time.


Chase Riveland  /s/ **Chase Riveland**                     November 25, 2009
Special Master

PDF created with pdfFactory trial version www.pdffactory.com

---

1  Monitoring reports for Heman G. Stark and Preston correctional facilities

2  Informal communications with Defendants

3  Defendants' Compliance Report, Oct. 14, 2008

4  Closed Case Summary – LH Timeliness Cases, May 1 through Sept. 30, 2009; Closed Case Detail of the PCD step on that report. Additionally, there were a small number of open cases at any given time, but their timeliness could not be determined because those reports showed indicia that they lack reliability.

5  Closed Case Summary – Extradition Cases, May 1 through Sept. 30, 2009.  While this report shows late cases, on examination of those individual cases, each shows an agent-supervisor conference within two business days after the parolee returned to California. The number of open extradition cases is unknown, so this may underreport this population somewhat.

6  Closed Case Summary – NIC Referral Cases, May 1 through Sept. 30, 2009. Two cases were initiated months after discovery to accommodate court proceedings or in an attempt at more informal handling. The number of open extradition cases is unknown, so this may underreport this population somewhat.

7  The Special Master reviewed an accidental sample of 45 individuals' records drawn from the monthly productions. Given the sample size and selection method, this may or may not be representative.

8  DJJ Notice of Rights Compliance Report for each of May through Sept. 2009; Closed Case Summary – Extradition Cases and Closed Case Summary – NIC Referral Cases, each run for May 1 through Sept. 30, 2009, and all individual cases on the latter two reports. Note that Hearing Decision NIC cases are included in the preceding reports.

   Note: although Defendants' revocation database has reports for notice of rights, they are not currently accurate. Information can only be discerned by reviewing individual cases. For this reason, the Special Master analyzed all individual cases in the special populations, but not the greater than 400 mainstream cases, relying instead on the CalPAP reports.

   There are a few populations not captured here, but they are unlikely to make an appreciable difference. Cases with holds initiated before Feb. 1, 2009 are not included. CalPAP reports show 12 such cases in May and June; these are the only months demonstrating this difference, but it is likely the pre-February holds would have been eliminated by July, or nearly so. DJJ Cases Closed, and DJJ Cases Closed With Hold Date After Feb. 1, 2009, for each of May and June 2009.

   "Non-707(b)" cases – a class of juveniles for whom responsibility has been returned to the counties – extremely rarely are charged mistakenly in the DJJ system before being transferred. CalPAP records seem to reflect only two during the Round. DJJ Cases Closed, May through Aug. 2009.

   Open cases for every population were not included in this analysis.

9  This is a measure used throughout CalPAP's data. It does not necessarily signify a threshold for compliance.

10  NOR Unsuccessful – Will Retry and NOR Unsuccessful – Will Not Retry, each run for May 1 through Sept. 30, 2009, and cases underlying them. These reports total 12 cases once the duplicates and data entry errors are removed.

11  The investigation occurs before CalPAP attorneys are appointed. Parolees have counsel of record related to prior criminal proceedings; some continue representation in parole revocation proceedings and some do not.

12  DJJ Date Case Assigned Compliance Report for each of May through Sept. 2009; the latter two populations constitute about 6% of those represented by CalPAP

13  Source for this paragraph is the revocation packets produced in the monthly document production and filed in the Individual Hearings folder of the Documents Relied Upon for this report. The total reviewed was 46, including three revocation extensions. Since this represents only 10% of the actions that proceeded to a step requiring counsel notification (see Closed Case Summary, May 1 through Sept. 30, 2009 Refer step for an approximate measure), and was an accidental sample, it may not be fully representative.

14  Document Production Itemization for each of May through Sept. 2009

15  Closed Case Summary – LH Timeliness Cases and Closed Case Summary - Extradition, both run for May 1 through Sept. 30, 2009, and Closed Case Detail reports related to them. Reliable figures are not available for open cases for these populations. The timeframe is not applied to NIC referrals.

36

PDF created with pdfFactory trial version www.pdffactory.com

[16] Closed Case Summary – LH Timeliness Cases and Closed Case Summary - Extradition, both run for May 1 through Sept. 30, 2009, and Closed Case Detail reports related to them. Reliable figures are not available for open cases for these populations. The timeframe is not applied to NIC referrals.

[17] CalPAP Requested Expedited Hearings, May 1 through Sept. 30, 2009

[18] The Special Master did not conduct a systematic review, but observed this in multiple hearing records and heard references on hearing recordings to this having occurred. Individual records from the monthly document productions; see also DJJ Cases Closed, May through Aug. 2009.

[19] Hearing Decision NIC, May 1 through Sept. 30, 2009

[20] DJJ Probable Cause Hearing Compliance Report, each of May through Sept. 2009; Closed Case Summary – Extradition Cases, May 1 through Sept. 30, 2009. This includes extradition cases but does not include cases with holds initiated before February 2009; it also excludes not in custody cases, as Defendants do not provide probable cause hearings in that instance. It does not include the likely very small number of "non-707b" cases. To the extent that there were postponements, these would be additional to the number of proceedings indicated here. Defendants' database contains a different total for unknown reasons.

[21] It is worth noting that timeliness numbers are sometimes inaccurate because staff is not fully conversant in use of the information system. To date, errors tend to *under*report timeliness as cases not closed out contemporaneously, or reopened for correction, give the false impression of late cases.

[22] For the complete definition, see *infra*

[23] The Special Master encountered 11 postponements in records originally reviewed for other purposes.

[24] Hearing Decision Dismiss, May 1 through Sept. 30, 2009

[25] Defendants' Compliance Report, Oct. 15, 2009, Exhibit 4

[26] This term is used to describe those revocation actions that follow the normal course. The concept excludes cases with special circumstances, such as not in custody hearings, extradition, parolee time waivers, optional waivers, and postponements.

[27] DJJ Revocation Hearing Cases-Over 35 Days, run for each of May through Sept. 2009. Closed Case Summary – LH Timeliness Cases, May 1 through Sept. 30, 2009 shows 54 cases closed, with 5 late; one of these involved a time waiver and was not late, per discussions with CalPAP.

The figures in this section do not include any cases with holds initiated before Feb. 1, 2009, the date the tracking system was initiated. It was not practical to determine how many such cases existed during the Round, but it is the Special Master's impression that there were few; CalPAP tracking indicates there were 12 known cases in May and June, most of which have been resolved before revocation hearing if they are consistent with the rest of the population, and numbers of additional cases would predictably have diminished further in later months.

[28] Open Case Summary, run on July 4, Aug. 2, Aug. 28, Oct. 14 and Oct. 19 and averaged. In this case, Open Case Summary was used because it *includes* extradition, activated optional waiver, and NIC cases, as there are not separate, functional reports for open cases among those populations.

[29] Summary – NIC Referral Cases and Hearing Decision NIC, each run for May 1 through Sept. 30, 2009; Case Status Report for each case contained therein

[30] Closed Case Summary – Extradition Cases, May 1 through Sept. 30, 2009

[31] Optional Waiver Closed Cases, May 1 through Sept. 30, 2009. Although the report title may imply other meanings, the Special Master verified with DJJ staff that this report captures only the taking of an optional waiver, not any steps related to activation or subsequent hearing. DJJ Optional Waiver Activated Cases, run for each of May through Sept. 2009. The Special Master has insufficient information to assess activated optional waivers that are pending hearing.

[32] CalPAP DJJ Statistics 50 Mile Report for each of Apr. through Sept. 2009

[33] Closed Case Summary – Supplemental Charge Cases, May 1 through Sept. 30, 2009; Open Case Summary -- Supplemental Charge Cases Oct. 19, 2009

[34] Joint Stipulation Regarding Modifications to Division of Juvenile Justice Parole Revocation Policies and Procedures, Sept. 10, 2009

[35] Closed Case Summary – NIC Referral Cases and Hearing Decision NIC, each run for May 1 through Sept. 30, 2009. One case mistakenly appears on both lists, reducing the total number. Compare to Closed Case Summary for that period.

[36] Closed Case Summary – NIC Referral Cases and Hearing Decision NIC, each run for May 1 through Sept. 30, 2009; Case Status Report for each case contained therein.

[37] Defendants' Compliance Report, Oct. 15, 2009

PDF created with pdfFactory trial version www.pdffactory.com

[38] See 3.260s in Individual Hearings folder of the Documents Relied Upon for this report, Plaintiffs' monitoring reports and letters

[39] *See, e.g.,* letter from C. Kendrick to M. Brady, Aug. 20, 2009

[40] Defendants' Compliance Report, Oct. 15, 2009

[41] JSTS Denial Report, May 1 through Sept. 30, 2009

[42] See, *e.g.,* Youth with Disabilities in the Correctional System: Prevalence Rates and Identification Issues, Robert B. Rutherford et al., citing multiple studies (disabilities found to range from 20% to 60%, with some specific needs as high as 76%); CDCR Budget Concept Statement Fiscal Year 2008/09, Division of Juvenile Justice/Juvenile Parole Board (reportedly asserts 80% of its youth have a qualifying disability and 50% of the population have effective communication needs).

[43] Document Production Itemization for each of May through Sept. 2009

[44] Appeals submitted with the document productions for May through Sept. 2009; DJJ Appeal Cases reports for the same period; email communication from C. Chen dated Nov. 22, 2009

[45] CalPAP information occasionally varied from this in minor ways, for unknown reasons.

[46] Document Production Itemizations, May through Sept. 2009

[47] During the Special Master's review for the instant report, one such case surfaced. This practice had occurred in the prior Round, as well.

[48] Source for this paragraph is DJJ Decision Review Cases for each of May through Sept. 2009 and the individual records in the Decision Review folder of the Documents Relied Upon for this report.

[49] See Appeal Response Timeframes, July 2009, and Plaintiffs' report concerning Sept. 2, 2009 visit to LACJ and Watts Parole

[50] *See, e.g.,* letter from C. Kendrick to M. Brady, Aug. 20, 2009

[51] CalPAP DJJ Rev. Extension Cases Closed, run for each of May through Sept. 2009. The JSTS report titled Revocation Extension Closed Case Summary by Facility shows 15 cases; this is likely because two cases for one parolee were consolidated.

[52] Revocation Extension Closed Case Summary for each of Sept. and Oct. 2009; Revocation Extension Open Case Summary Oct. 23, 2009

[53] Calculated from the dates listed on DJJ Rev. Extension Cases Closed, run for each of May through Sept. 2009. The JSTS report shows somewhat different numbers for unknown reasons.

[54] Revocation Extension Closed Case Summary by Facility, May 1 through Sept. 30 , 2009

[55] Calculated from the dates listed on DJJ Rev. Extension Cases Closed, run for each of May through Sept. 2009. This is determined by adding the timeframe requirements for each step up to this point.

[56] Revocation Extension Closed Case Summary by Facility, May 1 through Sept. 30 , 2009

[57] Calculated from the dates listed on DJJ Rev. Extension Cases Closed, run for each of May through Sept. 2009.

[58] Calculated from the dates listed on DJJ Rev. Extension Cases Closed, run for each of May through Sept. 2009.

PDF created with pdfFactory trial version www.pdffactory.com